(No. 78274.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. KENNETH DILWORTH, Appellee.

*Opinion filed January 18, 1996.*

NICKELS, J., joined by HARRISON and McMORROW, JJ., dissenting.

Roland Burris and James Ryan, Attorneys General, of Springfield, and James W. Glasgow, State's Attorney, of Joliet (Norbert J. Goetten, John X. Breslin and Lawrence M. Kaschak, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Peter A. Carusona, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a bench trial in the circuit court of Will County, defendant, Kenneth Dilworth, was convicted of unlawful possession of a controlled substance (cocaine) with intent to deliver while on school property (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1407(b)(2)). The circuit court had earlier denied defendant's motion to suppress evidence. The appellate court reversed defendant's conviction, finding that his motion to suppress evidence should have been granted. (267 Ill. App. 3d 155.) We allowed the State's petition for leave to appeal (145 Ill. 2d R. 315) and now reverse the appellate court.

## FACTS

Defendant was a 15-year-old student at the Joliet Township High Schools Alternate School. The Alternate School is unlike a regular public school in that only students with behavioral disorders attend it. A little more than 100 students attended the school at the relevant times.

According to the Alternate School handbook, which was admitted into evidence, the goal of the school's program is to create an environment that will allow students to modify their behavior in a positive direction. Students who improve their behavior are allowed to return to regular school. The school staff was listed as consisting of 11 teachers, four para-professionals, one social worker, one psychologist, one counselor, and, significantly, one liaison officer.

The liaison officer was Detective Francis Ruettiger. Ruettiger was a police officer employed by the Joliet police department and was assigned full-time to the Alternate School as a member of its staff. His primary purpose at the school was to prevent criminal activity. If he discovered criminal activity, he had the authority to arrest the offender and transport the offender to the

police station. Ruettiger also handled some disciplinary problems. Like the teachers, Ruettiger was authorized to give a detention, but not a suspension. Only the school principal and the director could suspend a student.

On November 18, 1992, two teachers asked Ruettiger to search a student, Deshawn Weeks, for possession of drugs. The teachers informed Ruettiger that they had overheard Weeks telling other students that he had sold some drugs and would bring more drugs with him to school the following day. The next day, Ruettiger searched Weeks' person in his office and found nothing. He then escorted Weeks back to his locker.

Defendant and Weeks met at their neighboring lockers. According to Ruettiger, the two adolescents began talking and giggling "like they put one over on [him]." Ruettiger further testified that they turned toward him and they were "looking, laughing at [him] like [he] was played for a fool." Ruettiger noticed a flashlight in defendant's hand and immediately thought that it might contain drugs. He grabbed the flashlight from defendant, unscrewed the top, and observed a bag containing a white chunky substance underneath the flashlight batteries. The substance later tested positive for the presence of cocaine. Defendant ran from the scene, but was captured by Ruettiger and transported to the police station. While there, defendant gave a statement admitting that he intended to sell the cocaine because he was tired of being poor.

Ruettiger explained that he had two reasons for seizing and searching the flashlight. He was suspicious that the flashlight contained drugs. Secondly, Ruettiger believed it was a violation of school rules to possess a flashlight on school grounds because a flashlight is a "blunt instrument." The school's disciplinary guidelines, of which all students must be informed when they enroll, prohibited the possession of "any object that can

be construed to be a weapon." Ruettiger had never seen a student with a flashlight at the school before. He admitted, however, that students were never specifically informed that flashlights were prohibited. Also, he did not consider a flashlight to be "contraband *per se.*"

Ruettiger further related that he had daily contact with each student at the Alternate School. Although he did not talk with each student individually every day, he did go into each classroom. Prior to arresting defendant, Ruettiger saw defendant during school several times a day and had always gotten along with him pretty well. On one occasion, two weeks before the arrest, a teacher had suspected defendant of selling drugs in class and asked Ruettiger to search him. Ruettiger did so and found nothing. At that time, defendant told Ruettiger that he did not have any drugs, but named another student who did. A search of the other student revealed marijuana and resulted in the student's arrest.

Defendant's teacher, Danica Grabavoy, testified that sometime soon after defendant was enrolled in the Alternate School, she reviewed the entire school handbook with him and his guardian. Among other things, the handbook explains the school's policies and disciplinary guidelines. On a page entitled "Alternate School Search Procedures," the handbook states:

> "**To protect the security, safety, and rights of other students and the staff at the Alternate School, we will search students.** This search may include the student's person, his/her belongings, and school locker. Search procedures may result from suspicions generated from direct observation or from information received from a third party.
>
> Search is done to protect the safety of students. However, if in the process any illegal items or controlled substances are found in a search, these items and the student will be turned over to the police." (Emphasis in original.)

Prior to trial, defendant moved to suppress the evi-

dence found in his flashlight. He argued that Ruettiger's seizure and search of the flashlight violated the fourth and fourteenth amendments to the United States Constitution. The circuit court conducted a hearing in which it denied the motion. The court found that Ruettiger was acting as an agent for the staff of the Alternate School when he seized and searched the flashlight. Noting that the school staff must deal with difficult students, the court held that the proper fourth amendment standard to apply in this case was the reasonable suspicion standard for searches of students by school officials (*New Jersey v. T.L.O.* (1985), 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733), rather than the general standard of probable cause. Alternatively, the court found that even if Ruettiger was acting as a police officer, he had "reasonable cause" to believe that the flashlight contained contraband.

Defendant was tried as an adult in a stipulated bench trial. The circuit court found defendant guilty and sentenced him as an adult to the minimum four-year term of imprisonment.

As previously noted, the appellate court reversed defendant's conviction outright based on its holding that his motion to suppress evidence should have been granted. The appellate court agreed with the lower court that the reasonable suspicion standard applied; however, it found that Ruettiger did not have reasonable suspicion to seize and search the flashlight. In the appellate court's opinion, Ruettiger had only a mere "hunch" that the flashlight contained drugs.

## ANALYSIS

The State contends that the circuit court properly denied defendant's motion to suppress evidence for two reasons: (1) Ruettiger properly seized the flashlight as contraband because defendant's possession of the flashlight violated the school's disciplinary guidelines;

and (2) Ruettiger had reasonable suspicion, as well as probable cause if required, to seize and search the flashlight. Defendant responds that Ruettiger's seizure and search of his flashlight contravened the fourth and fourteenth amendments to the United States Constitution.

Generally, a circuit court's ruling on a motion to suppress evidence is subject to reversal only if manifestly erroneous. (*People v. James* (1994), 163 Ill. 2d 302, 310.) Here, however, neither the facts nor the credibility of witnesses is questioned. We therefore find it proper to conduct *de novo* review in this cause. See *James*, 163 Ill. 2d at 310, quoting *People v. Foskey* (1990), 136 Ill. 2d 66, 76.

The fourth amendment to the United States Constitution provides that the Federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ***." (U.S. Const., amend. IV.) The fundamental purpose of this amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. (*Camara v. Municipal Court* (1967), 387 U.S. 523, 528, 18 L. Ed. 2d 930, 935, 87 S. Ct. 1727, 1730.) The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) extended this constitutional guarantee to searches and seizures conducted by State officials. *Elkins v. United States* (1960), 364 U.S. 206, 213, 4 L. Ed. 2d 1669, 1675, 80 S. Ct. 1437, 1442.

I

In *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733, the United States Supreme Court addressed the constitutionality of searches of students by teachers and school officials. In *T.L.O.*, a teacher discovered T.L.O., a 14-year-old high school student, smoking cigarettes in a lavatory in violation of

a school rule. The teacher took T.L.O. to the principal's office, where she was questioned by an assistant vice principal. T.L.O. denied that she had been smoking and claimed that she did not smoke at all. The school official demanded to see her purse, opened it, and found a pack of cigarettes. As the school official reached into the purse for the cigarettes, he noticed a package of cigarette rolling papers. In his experience, the possession of rolling papers by high school students was closely associated with the use of marijuana. A further, thorough search of the purse revealed a small amount of marijuana, a pipe, a number of empty plastic bags, a substantial quantity of one-dollar bills, a list of names of students who apparently owed T.L.O. money, and two letters implicating T.L.O. in marijuana dealing. The school official turned this evidence over to the police after notifying T.L.O.'s mother. T.L.O.'s mother accompanied T.L.O. to police headquarters, where T.L.O. confessed to selling marijuana at the high school. The State subsequently brought delinquency charges against her in juvenile court. T.L.O. sought to suppress the evidence of marijuana dealing, claiming the search was unconstitutional.

The Court initially determined that the fourth amendment to the United States Constitution applies to searches of students conducted by public school officials. (*T.L.O.*, 469 U.S. at 333-36, 83 L. Ed. 2d at 729-31, 105 S. Ct. at 738-40.) In doing so, the Court rejected the argument that public school officials are exempt from the dictates of the fourth amendment because they act *in loco parentis* in their dealings with students. *In loco parentis*, which literally means "[i]n the place of a parent" (Black's Law Dictionary 403 (5th ed. 1983)), is a common law doctrine that means a parent " 'may ... delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent

committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed.' " (*Vernonia School District 47J v. Acton* (1995), 515 U.S. 646, 655, 132 L. Ed. 2d 564, 575, 115 S. Ct. 2386, 2391, quoting W. Blackstone, Commentaries on the Laws of England 441 (1769).) The Court found such a view of things to be "not entirely 'consonant with compulsory education laws' " and to be inconsistent with its earlier decisions treating school officials as State actors for purposes of the due process and free speech clauses. (*T.L.O.*, 469 U.S. at 336, 83 L. Ed. 2d at 731, 105 S. Ct. at 740, quoting *Ingraham v. Wright* (1977), 430 U.S. 651, 662, 51 L. Ed. 2d 711, 724, 97 S. Ct. 1401, 1407.) Nonetheless, the Court emphasized that the State has a substantial interest in maintaining a proper educational environment for the schoolchildren entrusted to its custody and tutelage. "Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *T.L.O.*, 469 U.S. at 339, 83 L. Ed. 2d at 733, 105 S. Ct. at 741.

The Court explicitly recognized that, under the fourth and fourteenth amendments, schoolchildren have legitimate expectations of privacy in possessions brought with them to school. "In short, schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds." *T.L.O.*, 469 U.S. at 339, 83 L. Ed. 2d at 733, 105 S. Ct. at 741.

In balancing the competing interests of a school's need to maintain a proper educational environment and

the schoolchild's legitimate expectations of privacy, the Court held that teachers and school officials do not need a warrant before searching a student and need not adhere to the requirement that searches be based on probable cause. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." (*T.L.O.*, 469 U.S. at 341, 83 L. Ed. 2d at 734, 105 S. Ct. at 742.) The Court set forth a twofold inquiry for determining the reasonableness of any search. First, the action must be " 'justified at its inception' "; second, the search as actually conducted must be " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *T.L.O.*, 469 U.S. at 341, 83 L. Ed. 2d at 734, 105 S. Ct. at 743, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879.

Applying the test to the facts, the Court found that the school official's search of T.L.O.'s purse for cigarettes was reasonable, given the teacher's report that T.L.O. had been smoking in the lavatory in violation of school rules and that T.L.O. denied doing so. The Court characterized the school official's suspicion that T.L.O. had cigarettes in her purse as "the sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people'—including government officials—are entitled to rely," rather than "an 'inchoate and unparticularized suspicion or "hunch." ' " (*T.L.O.*, 469 U.S. at 346, 83 L. Ed. 2d at 737, 105 S. Ct. at 745, quoting *United States v. Cortez* (1981), 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695, and *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.) The Court proceeded to find the further search for marijuana reasonable as well, given the school official's observation of rolling papers. Consequently, the Court concluded that the evidence of marijuana dealing should have been admitted in T.L.O.'s juvenile delinquency proceedings.

## II

The State first argues that Ruettiger properly seized defendant's flashlight based solely on the Alternate School's disciplinary guidelines, which prohibited the possession of "any object that can be construed to be a weapon." The State maintains that the flashlight can be construed to be a weapon considering its blunt nature. Therefore, the State asserts, the flashlight was contraband *per se* in the context of this Alternate School and was properly seized and searched as such. (*Illinois v. Andreas* (1983), 463 U.S. 765, 77 L. Ed. 2d 1003, 103 S. Ct. 3319.) Although the circuit court made no ruling on this argument, a reviewing court may affirm the circuit court's decision based on any grounds in the record. *People v. Thomas* (1995), 164 Ill. 2d 410, 419.

Counsel for the State conceded at oral argument that, under the above logic, school officials could automatically seize and search any flashlight carried onto school grounds. Moreover, counsel admitted that, under his interpretation of the school's rule, any other blunt object, such as a book, could also be construed to be a weapon subject to automatic search and seizure. These are precisely the types of arbitrary invasions by government officials that the fourth amendment safeguards against. The State cannot compel attendance at public schools and then subject students to unreasonable searches of the legitimate, noncontraband items that they carry onto school grounds. (*T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733.) Accordingly, we reject the State's initial argument.

## III

The State next contends that, under the totality of the circumstances, Ruettiger had reasonable suspicion, as well as probable cause if required, to seize and search the flashlight. Defendant responds that Ruettiger had neither; rather, he seized and searched the flashlight on

a mere hunch in violation of defendant's constitutional rights.

Before addressing these contentions, we must determine whether the proper fourth amendment standard to apply in this case is the less stringent reasonable suspicion standard for searches of students by school officials (*T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733) or the general standard of probable cause. Defendant insists that because Ruettiger was a police officer, he was required to have probable cause to seize and search the flashlight.

The Court in *T.L.O.* stated that the standard of reasonableness applies to a search of a student "by a teacher or other school official." (*T.L.O.*, 469 U.S. at 341, 83 L. Ed. 2d at 734-35, 105 S. Ct. at 743.) In so ruling, however, the Court noted:

> "We here consider only searches carried out by school authorities acting alone and on their own authority. This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question." *T.L.O.*, 469 U.S. at 341 n.7, 83 L. Ed. 2d at 735 n.7, 105 S. Ct. at 743 n.7.

Decisions filed after *T.L.O.* that involve police officers in school settings can generally be grouped into three categories: (1) those where school officials initiate a search or where police involvement is minimal, (2) those involving school police or liaison officers acting on their own authority, and (3) those where outside police officers initiate a search. Where school officials initiate the search or police involvement is minimal, most courts have held that the reasonable suspicion test obtains. (See, *e.g.*, *Cason v. Cook* (8th Cir. 1987), 810 F.2d 188 (applying reasonable suspicion where a school official acted in conjunction with a liaison officer); *Martens v. District No. 220, Board of Education* (N.D. Ill. 1985), 620 F. Supp.

29 (applying reasonable suspicion where an officer's role in the search of a student was limited); *Coronado v. State* (Tex. Crim. App. 1992), 835 S.W.2d 636 (applying reasonable suspicion where a school official, along with a sheriff's officer assigned to the school, conducted various searches of a student); *In re Alexander B.* (1990), 220 Cal. App. 3d 1572, 270 Cal. Rptr. 342 (applying reasonable suspicion where a school official initiated an investigation and requested police assistance); see generally Annot., 31 A.L.R.5th 229, 330, 376 (1995) (discussing several pre-*T.L.O.* and post-*T.L.O.* cases).) The same is true in cases involving school police or liaison officers acting on their own authority. (See *In re S.F.* (1992), 414 Pa. Super. 529, 531, 607 A.2d 793, 794 (applying reasonable suspicion to a search by a "plainclothes police officer for the School District of Philadelphia"); *Wilcher v. State* (Tex. Ct. App. 1994), 876 S.W.2d 466, 467 (applying reasonable suspicion where the searcher was "a police officer for the Houston Independent School District"). But see *A.J.M. v. State* (Fla. App. 1993), 617 So. 2d 1137 (holding that a school resource officer employed by a sheriff's office must have probable cause to search).) However, where outside police officers initiate a search, or where school officials act at the behest of law enforcement agencies, the probable cause standard has been applied. See, *e.g.*, *F.P. v. State* (Fla. App. 1988), 528 So. 2d 1253 (applying probable cause where an outside police officer investigating an auto theft initiated the search of a student at school).

In the present case, the record shows that Detective Ruettiger was a liaison police officer on staff at the Alternate School, which is a high school for students with behavioral disorders. He worked there full-time, handling both criminal activity and disciplinary problems. Two teachers initially asked Ruettiger to search a student other than defendant for drugs. Once that

search proved fruitless, he escorted the student back to his locker. The student met defendant at their neighboring lockers. In Ruettiger's presence, the two adolescents began talking and giggling as if they had fooled Ruettiger. Ruettiger noticed a flashlight in defendant's hand and immediately thought that it might contain drugs. He then seized and searched the flashlight, finding cocaine. Given this scenario, this case is best characterized as involving a liaison police officer conducting a search on his own initiative and authority, in furtherance of the school's attempt to maintain a proper educational environment. We hold that the reasonable suspicion standard applies under these facts.

This holding is consistent with this court's precedent. In *In re Boykin* (1968), 39 Ill. 2d 617, decided before *T.L.O.*, this court applied a reasonableness standard to a search of a student at school. There, an assistant principal summoned two police officers to a Chicago high school. He informed the officers that he had received anonymous information that one of the students had a gun. The student was removed from his classroom and escorted to the hall, where the officers were waiting. After the student denied that he had a gun, one of the officers held the student's arms while the other officer removed a gun from his pants pocket. The *Boykin* court simply held that the search was reasonable under the circumstances and therefore rejected the student's claims that the search violated his rights under the fourth and fourteenth amendments to the United States Constitution and under section 6 of article II of the Illinois Constitution of 1870.

Our holding in this case also comports with *Vernonia School District 47J v. Acton* (1995), 515 U.S. 646, 132 L. Ed. 2d 564, 115 S. Ct. 2386 (upholding the constitutionality of drug tests for student athletes in public high schools). There, the United States Supreme Court

utilized a three-prong test for determining whether special needs beyond normal law enforcement require a departure from the usual fourth amendment standard of probable cause and a warrant. The competing interests of the individual and the State were balanced by an examination of the following: (1) the nature of the privacy interest upon which the search intrudes, (2) the character of the search, and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means for meeting it.

An analysis of each of these three factors supports our holding that reasonable suspicion, not probable cause, is the proper fourth amendment standard to be applied in this case. As to the first factor, the nature of the privacy interest upon which the search intrudes, it must be remembered that we are dealing with schoolchildren here. In this respect, the *Vernonia* majority stated:

> "Fourth Amendment rights *** are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required [to do a variety of things]. *** '[S]tudents within the school environment have a lesser expectation of privacy than members of the population generally.' *T.L.O.*, 469 U.S., at 348 (Powell, J., concurring)." *Vernonia*, 515 U.S. at 656-57, 132 L. Ed. 2d at 576-77, 115 S. Ct. at 2392.

The second factor is the character of the search. The intrusion complained of in this case is the seizure and search of defendant's flashlight by a school liaison officer. Of utmost significance, the liaison officer had an *individualized* suspicion that defendant's flashlight contained drugs. He confirmed his suspicion by searching only that flashlight. Thus, we find this search as conducted to be minimally intrusive.

The final factor—the nature and immediacy of the governmental concern at issue, and the efficacy of the

means for meeting it—also weighs in favor of the reasonable suspicion standard here. There is no doubt that the State has a compelling interest in providing a proper educational environment for students, which includes maintaining its schools free from the ravages of drugs. (See *Vernonia*, 515 U.S. at 661, 132 L. Ed. 2d at 579-80, 115 S. Ct. at 2395; see generally *T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733.) As to the efficacy of the means for meeting this interest, it is relevant that the search at issue took place at an alternate school for students with behavioral disorders. In order to maintain a proper educational environment at this particular school, school officials found it necessary to have a full-time police liaison as a member of its staff. The liaison officer assisted teachers and school officials with the difficult job of preserving order in this school. See *Vernonia*, 515 U.S. at 663, 132 L. Ed. 2d at 581, 115 S. Ct. at 2396 (noting that school teachers are ill-prepared to spot and bring to account drug abuse).

In sum, our consideration of the three *Vernonia* factors supports our application of the reasonable suspicion standard in the case at bar. The same concerns discussed above prompted the Supreme Court in *T.L.O.* and *Vernonia* to depart from the probable cause standard where schoolchildren were involved.

IV

The dissent does not agree that reasonable suspicion is the proper fourth amendment standard to be applied in this case. In reaching this conclusion, the dissent (1) wrongly claims that the Supreme Court in *T.L.O.* and *Vernonia* applied a reasonableness standard to the searches before them because of a "special relationship between student and teacher"; (2) improperly creates a distinction between liaison police officers permanently assigned to schools and "school police"; and (3) misconstrues Ruettiger's testimony that his primary purpose

at the school was to prevent criminal activity. The dissent's analysis loses sight of the forest for the trees.

The main reason the Supreme Court majorities in *T.L.O.* and *Vernonia* lowered the fourth amendment standard applicable to searches of students at school was *to protect and maintain a proper educational environment for all students,* not because of any real or imagined "special relationship" between students and teachers. Professor LaFave discussed this subject at length in his treatise. He first commended the *T.L.O.* Court's unequivocal rejection of the use of the *in loco parentis* doctrine as a basis for its holding. (4 W. LaFave, Search & Seizure § 10.11(a), at 802-06 (3d ed. 1996) (hereinafter LaFave).)

> " 'One of the things that makes *in loco parentis* such an erroneous phrase in this context is precisely the absence of a genuinely parental protective concern for the student who is threatened with the school's power. It is presumably a characteristic of the use of parental force against a child that the force is tempered by understanding and love based on a close, intimate, and permanent child-parent relationship. What so many of the courts persist in talking about as a parental relationship between school and student is really a law enforcement relationship in which the general student society is protected from the harms of anti-social conduct.' " (LaFave § 10.11(a), at 806, quoting W. Buss, *The Fourth Amendment and Searches of Students in Public Schools,* 59 Iowa L. Rev. 739, 768 (1974).)

Professor LaFave elaborated on what he considered to be a more proper theory behind school search cases:

> "[I]t would appear that a strong case can be made that school searches, as a class, are directed to a rather special public concern—the maintenance of a proper educational environment—which is deserving of a high level of protection. This concern has, if anything, heightened in recent years. 'The problem of drug abuse among students has reached serious proportions and is increasingly recognized as a major national problem.' The point is not simply that

there are many drug offenses occurring, for certainly an increase in crime is alone no basis for abandoning the usual Fourth Amendment safeguards. Rather, it is the educational setting which is important. As one court has noted:

> The school authorities have an obligation to maintain discipline over the students. It is recognized that, when large numbers of teenagers are gathered together in such an environment, their inexperience and lack of mature judgment can often create hazards to each other. Parents, who surrender their children to this type of environment, *** have a right to expect certain safeguards.
>
> It is in the high school years particularly that parents are justifiably concerned that their children not become accustomed to antisocial behavior, such as the use of illegal drugs. The susceptibility to suggestion of students of high school age increases the danger. Thus, it is the affirmative obligation of the school authorities to investigate any charge that a student is using or possessing narcotics and to take appropriate steps, if the charge is substantiated.

In short, a high school 'is a special kind of place in which serious and dangerous wrongdoing is intolerable.' The state, having compelled students to attend school and thus 'associate with the criminal few—or perhaps merely the immature and unwise few—closely and daily,' thereby 'owes those students a safe and secure environment.' " (LaFave § 10.11(b), at 809-10.)

We agree with Professor LaFave's observations.

Furthermore, as earlier noted, the *Vernonia* majority specifically found that students within the school environment have a lesser expectation of privacy than members of the population generally. We are convinced that, in this case, when the students' lessened expectations of privacy are balanced against the Alternate School's compelling interest in maintaining a proper educational environment for all its students, a departure

from the usual probable cause standard is not only warranted, but required. Therefore, we reiterate that the Supreme Court's decisions in *T.L.O.* and *Vernonia* support our application of the reasonable suspicion standard in this case.

The dissent also attempts to create a distinction between "school police" and liaison police officers permanently assigned to a school. The dissent apparently believes that "school police" can search with reasonable suspicion because they are "employed by and [are] ultimately responsible to the school district." The dissent then asserts that, in contrast, liaison police officers permanently assigned to a school must have probable cause to search because they are "employed by and ultimately responsible to local law enforcement authorities." We cannot agree that this distinction exists, or that it would be controlling even if it were to exist. We cite *In re S.F.* (1992), 414 Pa. Super. 529, 607 A.2d 793, and *Wilcher v. State* (Tex. Ct. App. 1994), 876 S.W.2d 466, as examples where courts have applied the reasonable suspicion standard to searches of students at school by school police or liaison officers acting on their own authority. In *In re S.F.*, the Supreme Court of Pennsylvania applied the reasonable suspicion standard to a search of a student at school by a police officer. (*In re S.F.*, 414 Pa. Super. at 531, 607 A.2d at 794.) The officer's status in *S.F.* was undoubtedly quite similar to Ruettiger's status here. The *S.F.* opinion specifically notes that the officer there had worked as a plainclothes police officer for the school district of Philadelphia for four years and that he personally had "made 15 to 20 narcotics arrests during that time." (*In re S.F.*, 414 Pa. Super. at 531, 607 A.2d at 794.) In *Wilcher*, the Texas appellate court applied the reasonable suspicion standard to a search of a student at school by a "police officer for the Houston Independent School District."

(*Wilcher*, 876 S.W.2d at 467.) Although the officer there did not effect the arrest of the student herself, there is nothing in the opinion suggesting that she lacked the authority to do so. (See *Wilcher*, 876 S.W.2d 466.) We also fail to see how such a distinction would be material under the dissent's analysis. The "special relationship" the dissent apparently finds controlling of this issue does not exist between students and "school police" to any greater degree than it does between students and liaison police officers.

Next, the dissent places undue emphasis on Ruettiger's testimony that his primary purpose at the school was to prevent criminal activity. This statement must be viewed in context. Ruettiger's overall purpose at the Alternate School was to assist other school officials in their attempt to maintain a proper educational environment for the students. As the record here reveals, Ruettiger was listed in the school handbook as a member of the Alternate School staff. He worked at the school full-time, handling both criminal activity and disciplinary problems. The teachers referred such problems to Ruettiger, as is evidenced by the teachers' report to Ruettiger concerning Deshawn Weeks and an earlier report concerning defendant himself. Ruettiger also had daily contact with the students at the Alternate School. Under all these circumstances, Ruettiger is properly considered to be a school official.

Last, the dissent finds it fundamentally unfair to conclude that defendant has diminished privacy rights while a student at a public school, and then to charge and sentence defendant to four years in the penitentiary as an adult with evidence obtained as a result of his diminished privacy rights. Defendant has not argued, and we cannot say, that our General Assembly's decision to punish as adults those young offenders who intend to sell drugs while on school grounds changes the

constitutional standard to be applied. If anything, the legislature's stiff penalty for defendant's crime reflects a well-reasoned policy of zero tolerance for drugs in our troubled public schools.

For the reasons stated, we find that reasonable suspicion is the proper fourth amendment standard to be applied in the case *sub judice*.

## V

There remains the question of the constitutionality of the search in this case. When evaluating the reasonableness of a search, "[e]ach case must stand or fall on its own set of concrete facts." (*People v. Galvin* (1989), 127 Ill. 2d 153, 174.) "[T]he requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment ... .'" *T.L.O.*, 469 U.S. at 346, 83 L. Ed. 2d at 737, 105 S. Ct. at 745, quoting *Hill v. California* (1971), 401 U.S. 797, 804, 28 L. Ed. 2d 484, 490, 91 S. Ct. 1106, 1111.

As earlier noted, the Court in *T.L.O.* set forth a twofold inquiry for determining whether, under all the circumstances, a search of a student is reasonable: the action must be justified at its inception, and the search as actually conducted must be reasonably related in scope to the circumstances which justified the interference in the first place. (*T.L.O.*, 469 U.S. at 341, 83 L. Ed. 2d at 734, 105 S. Ct. at 743.) The Court further explained:

> "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 341-42, 83 L. Ed. 2d at 734-35, 105 S. Ct. at 743.

For Ruettiger's search of defendant's flashlight to have been justified at its inception, Ruettiger must have had reasonable grounds for suspecting that the flashlight contained drugs in violation of the law and the school rules. Two teachers had informed Ruettiger that they had overheard Deshawn Weeks telling other students that he had sold some drugs and would bring more drugs with him to school the following day. Ruettiger searched Weeks the next day, finding nothing. Ruettiger then walked Weeks back to his locker, where the defendant met with Weeks. The two teenagers began talking and giggling "like they put one over on [Ruettiger]." They turned toward Ruettiger and were "looking, laughing at [Ruettiger] like [he] was played for a fool." Defendant was holding a flashlight in his hand. Ruettiger had never seen a student with a flashlight at the school before, so he considered it a very unusual item for defendant to have. The totality of these circumstances would lead a reasonable person to suspect that defendant was carrying drugs in his flashlight. Indeed, upon seeing the flashlight in defendant's hand, Ruettiger testified that he immediately thought that it might contain drugs. Although an objective standard must be used in determining whether reasonable suspicion was present, the testimony of an officer as to his subjective feelings is one of the factors that may be considered in the totality of the circumstances. (*Galvin*, 127 Ill. 2d at 166-68.) Ruettiger's testimony as to his subjective belief can thus be considered as additional support for our conclusion.

We also find that the search as conducted here was permissible in its scope. Ruettiger had individualized suspicion that defendant's flashlight contained drugs. He seized and searched only that flashlight. This measure was reasonably related to the objectives of the search and was not excessively intrusive.

For the foregoing reasons, we conclude that Ruettiger's seizure and search of defendant's flashlight was constitutional because it was reasonable under the totality of the circumstances. We therefore reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE NICKELS, dissenting:

I respectfully dissent. I cannot agree with the majority that a police officer whose self-stated primary duty is to investigate and prevent criminal activity may search a student on school grounds on a lesser fourth amendment standard than probable cause merely because the police officer is permanently assigned to the school and is listed in the student handbook as a member of the school staff. The majority's departure from a unanimous line of Federal and State decisions places form over substance and opens the door for widespread abuse and erosion of students' fourth amendment rights to be free from unreasonable searches and seizures by law enforcement officers.

The majority reaches its conclusion by: (1) relying on the faulty premise that Ruettiger is a school official for fourth amendment purposes; (2) misreading the line of school search decisions involving police; and (3) relying on conclusions from factually distinguishable United States Supreme Court decisions rather than utilizing the rationale the Court used to reach those conclusions. I address each issue in turn.

I

The majority takes the position that for the purposes of the fourth amendment, Ruettiger is a school official similar to a teacher or principal. However, Ruettiger is a police officer. He is employed by the City of Joliet po-

lice department and is assigned to patrol the Alternate School grounds as a police liaison officer. Ruettiger's self-stated primary duty at the school is to investigate and prevent criminal activity. When Ruettiger discovers such activity, he arrests the offender and takes him or her to the police station. Ruettiger is not employed by the Alternate School and is not a teacher or administrator. Ruettiger is also not a member of the Alternate School security staff, which the school employs. Although Ruettiger is listed in the school handbook as a member of the school support staff, and had the authority to give a detention, and handles "some" disciplinary problems, these additional factors do not detract from the fact that Ruettiger was still a police officer whose primary duty was the same as any police officer assigned to patrol any area: to investigate and prevent criminal activity.

The fact that Ruettiger was a police officer, and acted as one in seizing and searching defendant's flashlight, is clear from the record. After observing and questioning defendant in the hallway, Ruettiger seized and searched defendant's flashlight because he suspected it contained drugs. After finding cocaine, Ruettiger chased and captured defendant, arrested him, placed him in custody, handcuffed him, placed him in the squad car, and took him down to the investigative division of the Joliet police station. There, Ruettiger handcuffed defendant to a wall, read him his *Miranda* rights, and interrogated him. These were the acts of a police officer, not a school official, a point the State has acknowledged in its brief:

> "The search of defendant in the present case is best characterized as one conducted *solely by a member of law enforcement*, since Officer Ruettiger was not directed by any school official to search the defendant. Likewise, *no school officials participated, even to a minor extent, in the search*." (Emphasis added.)

See also *In re E.M.* (1994), 262 Ill. App. 3d 302, where our appellate court noted that a school principal's interrogation of a student at school was for school disciplinary purposes while a police liaison officer's subsequent interrogation of that student at school regarding the same incident was for law enforcement purposes. *Cf. People v. Bowers* (1974), 77 Misc. 2d 697, 356 N.Y.S.2d 432, where a school security officer, unlike a faculty member, was required to have probable cause rather than reasonable suspicion in searching a student because: (1) the security guard was under the control of the police commissioner and had to abide by the police department's guidelines; and (2) the security guard was placed on school grounds solely for security purposes and served no educational function at the school.

The majority, however, fails to acknowledge this clear point and argues that I place undue emphasis on Ruettiger's testimony that his primary purpose at the school was to investigate and prevent criminal activity. However, I only emphasize so strongly Ruettiger's testimony as to his primary duty at the school because the majority cannot see what is so obvious in this case: Ruettiger's self-stated primary duty at the school, as displayed by his actions in arresting defendant, is that of a police officer, not a school official. See *In re F.P. v. State* (Fla. App. 1988), 528 So. 2d 1253, 1254 n.1 (where the school resource officer, an employee of the local sheriff's department assigned to the school, worked "*primarily* in delinquent prevention, education and counseling, but also handle[d] any law enforcement matter[ ] that [arose]" (emphasis added)).

In addition to relying on the fiction that Ruettiger is a school official, the majority argues that support for its decision exists in previous case law, and specifically in two United States Supreme Court decisions, for its holding that Ruettiger was allowed to search defendant

based only on reasonable suspicion. However, there is no support for the majority's conclusion in any previous decision.

## II

### Federal and State Decisions

The majority examines the line of Federal and State decisions involving police searches of students at school and concludes that the reasonable suspicion standard applies to Ruettiger's action here. This conclusion, however, is based on a misreading of two decisions. Every Federal and State decision on this matter has rejected the majority's view.

All Federal and State decisions reviewed indicate that *police officers, including police liaison officers,* are required to have probable cause to search a student if they are significantly involved in the search. This was the law prior to *T.L.O.* (see *Picha v. Wielgos* (N.D. Ill. 1976), 410 F. Supp. 1214, 1219 (cited by the United States Supreme Court in *T.L.O.* in declining to address whether the reasonable suspicion standard applies to school searches involving police); *M.J. v. State* (Fla. App. 1981), 399 So. 2d 996, 998; *M. v. Board of Education Ball-Chatham Community Unit School District No. 5* (S.D. Ill. 1977), 429 F. Supp. 288, 292; *State v. Young* (1975), 234 Ga. 488, 499-500, 216 S.E.2d 586, 594), and has also been the law after *T.L.O.* As Professor LaFave has noted:

> "Lower courts have held or suggested that the usual probable cause test obtains if the police are involved in the search in a significant way." (4 W. LaFave, Search & Seizure § 10.11(b) (3d ed. 1996) (hereinafter LaFave).)

(See *A.J.M. v. State* (Fla. App. 1993), 617 So. 2d 1137; *In re Devon T.* (1991), 85 Md. App. 674, 701, 584 A.2d 1287, 1300; *F.P. v. State* (Fla. App. 1988), 528 So. 2d 1253.) This analysis applies to police liaison officers as well. See *Coronado v. State* (Tex. Ct. App. 1991), 806 S.W.2d

302, *rev'd on other grounds* (Tex. Crim. App. 1992), 835 S.W.2d 636; *Cason v. Cook* (8th Cir. 1987), 810 F.2d 188.

Although several decisions have allowed student searches under the reasonable suspicion standard where police have participated in the search (see *Martens v. District No. 220, Board of Education* (N.D. Ill. 1985), 620 F. Supp 29; *Cason v. Cook* (8th Cir. 1987), 810 F.2d 188), these decisions have stressed that police involvement in the searches was minimal. See also *Coronado v. State* (Tex. Ct. App. 1991), 806 S.W.2d 302, *rev'd on other grounds* (Tex. Crim. App. 1992), 835 S.W.2d 636; *In re Alexander* (1990), 220 Cal. App. 3d 1572, 1577 n.1, 270 Cal. Rptr. 342, 344 n.1 (where courts held that the reasonable suspicion standard applies where school officials request police assistance in searching a student because the police are not the primary actors but are merely assisting school officials).

The majority attempts to find support for its holding by stating that the reasonable suspicion standard applies in those cases "involving school police or liaison officers." (169 Ill. 2d at 207.) The two decisions on which the majority relies for this assertion, however, *Wilcher v. State* (Tex. Ct. App. 1994), 876 S.W.2d 466, and *In re S.F.* (1992), 414 Pa. Super. 529, 607 A.2d 793, not only fail to address the issue of what fourth amendment standard applies, they do not involve police liaison officers. The two decisions involve "school police," which differ from police liaison officers in several significant respects. First, school police are employed by a school district while police liaison officers are employed by the local police department. Thus, while a school police officer is employed by and is ultimately responsible to the school district, a police liaison officer, such as Ruettiger, is employed by and ultimately responsible to local law enforcement authorities. Obviously, school districts and local law enforcement authorities have different mis-

sions. Also, while Ruettiger is assigned to the school, he still operates out of the police station, as was seen in this case. Ruettiger arrested defendant, placed him in his squad car, brought him to the police station, and interrogated him there.

School police also have duties that are significantly more limited than police liaison officers, such as Ruettiger, a point made clear in *Wilcher*. The *Wilcher* court noted that the duties of the school police officer there "entailed quelling disturbances and generally carrying out the various school policies applicable to her job assignment." (*Wilcher*, 876 S.W.2d at 467.) In fact, the *Wilcher* court specifically noted that the school police officer there did not arrest the defendant after he emptied his pockets and revealed contraband. Instead, the school police officer called the Houston police department to have a police officer sent to the school to take over the search and investigation. (*Cf. In re Frederick B.* (1987), 192 Cal. App. 3d 79, 88-89, 237 Cal. Rptr. 338, 344 (noting that school security guards, although peace officers for purposes of carrying out their duties, are of a special category, and are carefully limited in their powers and scope of operation).) In contrast to school police, Ruettiger's primary duty at the school was that of any police officer, to investigate and prevent criminal activity, arresting those he found violating the law. Unlike "school police," Ruettiger's duties were not limited in any manner. Ruettiger not only instigated the seizure and search, he arrested defendant, handcuffed him, took him to the station, read him his *Miranda* rights, and interrogated him.

The distinction between school police and police liaison officers is significant because every case involving police liaison officers has indicated that probable cause is required if the officer acts on his own initiative, as Ruettiger did here. (See *Coronado v. State* (Tex. Ct. App.

1991), 806 S.W.2d 302; *Cason v. Cook* (8th Cir. 1987), 810 F.2d 188.) As the *Coronado* court noted, citing *Cason*:

"This same standard [reasonableness] applies when school officials conduct the search in question in conjunction with, *but not at the behest of, police officers who are assigned to the school*." (Emphasis added.) (*Coronado*, 806 S.W.2d at 303.)

Surely, if the reasonable suspicion standard is not applicable to a police liaison officer directing a school official to conduct a search, it is not applicable where that same police liaison officer conducts a search on his own initiative, without the involvement of any school official, as was done here.

The majority incorrectly assumes that I approve of the *Wilcher* and *S.F.* decisions that allow "school police" to search students on the basis of reasonable suspicion. I do not necessarily agree with those decisions, but instead analyze them only to (1) note that the issue of what standard to search applied was not raised or addressed in those cases, and (2) distinguish them from cases involving police liaison officers, such as *Coronado* and *Cason*, which require probable cause.

The majority also attempts to find support for its conclusion in *Boykin*. However, *Boykin* provides the majority no support because it does not present the same facts as the instant case. As the majority acknowledges, the principal in *Boykin* wished to search a student and requested assistance from police assigned to the school. This court found the search reasonable. Thus, *Boykin* is similar to cases such as *Coronado*, which conclude that when police merely assist school officials in a search, the standard to search is reasonable suspicion. Those same cases note, however, that if a principal searches a student at the behest of law enforcement officials, probable cause is required. The same would certainly be true if the officer instigated and conducted the search on his own without the involvement of any school official.

The majority also finds that Ruettiger initiated the search to further the school's attempt to maintain a proper educational environment. However, any police search at a school, or even of a schoolchild outside of school, can be said to have been performed to maintain a proper educational environment. This does not allow a police officer, whose primary duty is to investigate and prevent criminal activity, the right to search a student on mere whim and less than probable cause in direct contravention of a student's constitutional rights.

In sum, not one case involving a police search of a student at school, including cases involving police liaison officers, supports the majority's conclusion. In fact, every authority available has rejected the majority's view. The majority finds support only by misreading the facts of *Wilcher* and *S.F.*, decisions that involve "school police" rather than police liaison officers. The result is that this court has for the first time in a long line of cases departed from the overwhelming view that police officers, even liaison police officers, are required to have probable cause to search a student on school grounds when instigating and carrying out a search.

### III

The majority also attempts to find support for its position in two Supreme Court decisions, *T.L.O.* and *Vernonia*. However, the majority errs in relying simply on the results of those two factually distinguishable decisions rather than on the analysis which led the court to its conclusions. Both *T.L.O.* and *Vernonia* allowed school officials, not police authorities, to search students for noncriminal purposes based on only a reasonable suspicion. The results of *T.L.O.* and *Vernonia* thus do not apply to the instant case because the search here was conducted by a police officer investigating criminal activity for the purpose of facilitating a criminal case against defendant. A thorough examination of the three-

part test enunciated by the Supreme Court in *Vernonia* reveals this distinction and the flaws in the majority's cursory analysis.

(i)

The first factor in balancing the competing interests of the individual and the State is the nature of the privacy interest upon which the search intrudes. The majority in the instant case concludes that because defendant was a child in school, he had a lowered expectation of privacy. (169 Ill. 2d at 209.) This arbitrary and somewhat simplistic holding, however, fails to consider the factor the *Vernonia* Court found most relevant to this issue: defendant's privacy interest in relation to the State's role in conducting the search.

The *T.L.O.* Court did not elaborate on the reasons for its finding that a schoolchild has a diminished expectation of privacy, a point noted by Justice Powell in his concurrence. Justice Powell, however, emphasized that school "teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child." (*T.L.O.*, 469 U.S. at 348, 83 L. Ed. 2d at 739, 105 S. Ct. at 746 (Powell, J., concurring).) Justice Powell continued:

> "The special relationship between teacher and student also distinguishes the setting within which schoolchildren operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between [teachers] and [their] pupils. Instead, there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education." (*T.L.O.*, 469 U.S. at 349-50, 83 L. Ed. 2d at 740, 105 S. Ct. at 747 (Powell, J., concurring).)

Justice Powell's concurrence directly distinguishes the instant case from *T.L.O.* and *Vernonia*. In both *T.L.O.* and *Vernonia*, school officials, sharing a commonality of interests with their students, conducted the searches in question. Here, a police officer, charged with the adversarial responsibility of investigating criminal activity and arresting those who violate the law, conducted the search.

The special relationship between student and teacher noted by Justice Powell was recently stressed by the United States Supreme Court in articulating the reasons why a schoolchild has a diminished expectation of privacy in school with respect to school officials. (See *Vernonia*, 515 U.S. 646, 132 L. Ed. 2d 564, 115 S. Ct. 2386.) The *Vernonia* Court noted that while expectations of privacy vary according to context, such as whether an individual is in a car, at work, or in his home,

> "the legitimacy of certain privacy expectations vis-a-vis the State may depend upon the individual's legal relationship with the State." (*Vernonia*, 515 U.S. at 654, 132 L. Ed. 2d at 575, 115 S. Ct. at 2391.)

The Court noted that the most important factor concerning the privacy interest of schoolchildren is the special relationship between the subject of the search, the schoolchildren, and the State in its role in conducting the search, as schoolmaster, guardian and tutor:

> "The most significant element in this case is the [privacy interest of school children]; that the [search] was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care. Just as when the government conducts a search in its capacity as employer (a warrantless search of an absent employee's desk to obtain an urgently needed file, for example), the relevant question is whether that intrusion upon privacy is one that a reasonable employer might engage in [citation]. *[S]o also when the government acts as guardian and tutor the rele-*

*vant question is whether the search is one that a reason-able guardian and tutor might undertake."* (Emphasis added.) *Vernonia,* 515 U.S. at 665, 132 L. Ed. 2d at 582, 115 S. Ct. at 2396-97.

In the instant case, the State did not act as guardian and tutor in conducting the search. Instead, the State acted as adversarial law enforcer. Ruettiger was not as-signed to the school to act as guardian and tutor. He was at the school primarily to investigate and prevent criminal activity and arrest those who violate the law. Thus, the special relationship of the kind noted by Justice Powell in *T.L.O.,* and by the majority in *Ver-nonia,* did not exist between defendant and Ruettiger. Listing Ruettiger as a member of the school staff and al-lowing him to give a detention does not alter his pri-mary role at the school, which Ruettiger readily admit-ted was to investigate and prevent criminal activity. To find that Ruettiger acted as guardian and tutor for the purposes of the fourth amendment in his relationship with defendant denies the facts of the case. The rele-vant question to be asked here, then, is whether the search is one that a reasonable police officer might undertake, one based on probable cause. The answer is no.

Thus, while defendant was at school, his expectation of privacy was diminished in relation to school officials, such as teachers or principals, to whom he was entrusted and who served as guardian and tutor in a nonadver-sarial role. However, defendant's right to an expecta-tion of privacy was not diminished in relation to the State in its adversarial role as law enforcer. A school child's expectation of privacy *vis-a-vis* the State as po-lice officer, even a police liaison officer, is not diminished simply because the child is at school. See *Griffin v. Wisconsin* (1987), 483 U.S. 868, 873-76, 97 L. Ed. 2d 709, 717-19, 107 S. Ct. 3164, 3168-70 (where the Court noted that while a probationer has a lesser privacy interest

with respect to the State acting as probation officer, the probation officer has in mind the welfare of the probationer and is not a police officer charged with the duty of investigating criminal activity).

The majority finds that I have erred in using the special relationship between student and teacher noted by Justice Powell and emphasized by the Court in *Vernonia*. The majority believes that I find that the Supreme Court in *T.L.O.* and *Vernonia* applied a reasonableness standard because of this special relationship. I note, however, that my analysis is not so simplistic. The special relationship between pupil and teacher is relevant to the student's legitimate expectation of privacy, which is but one of three factors the Supreme Court has balanced in lowering the standard to search students. Moreover, while the majority relies on Professor LaFave's citation to W. Buss, who argues against the *in loco parentis* theory (169 Ill. 2d at 211), Professor LaFave thereafter notes that the Supreme Court in *Vernonia* "used the more straightforward proposition that the Fourth Amendment's ' "reasonableness" inquiry cannot disregard the school's custodial and tutelary responsibilities for children.' " LaFave § 10.11(a), at 806, quoting *Vernonia School District 47J v. Acton* (1995), 515 U.S. 646, 656, 132 L. Ed. 2d 564, 576, 115 S. Ct. 2386, 2392.

The majority also notes Professor LaFave's "more proper" theory of school search decisions. (169 Ill. 2d at 211-12.) However, Professor LaFave cautions that the matter is not "free of all doubt" (LaFave § 10.11(b), at 809) and further cautions at the end of this section:

> "[M]ention must be made of the fact that all of the preceding discussion has been premised on the assumption that the search of the student in question was conducted by school authorities without the inducement or involvement of police." (LaFave § 10.11(b), at 832.)

And, as noted previously, Professor LaFave concludes

by noting that the usual probable cause test obtains where police are involved in the search in a significant manner. (LaFave § 10.11(b), at 832.) Ruettiger, a police officer whose self-stated primary duty at the school was that of a police officer, to investigate and prevent criminal activity, was involved in a significant manner in the search here.

It is also important to note that while the majority finds that defendant had a diminished right to privacy in school, defendant was charged and sentenced to four years in the penitentiary as an adult. I find it fundamentally unfair and inconsistent with compulsory school attendance laws to conclude that defendant had diminished privacy rights in relation to a police officer assigned to a school, whose primary duty was to investigate and prevent criminal activity, and then to charge and sentence defendant as an adult with evidence obtained by that officer.

(ii)

The next factor considered in this balance is the character of the intrusion. The majority finds the intrusion minimal because Ruettiger limited his search to defendant's flashlight. However, the majority cannot reconcile this finding with the Supreme Court's holding in *T.L.O.* that a seizure and search of a child's possessions, such as the handbag or purse at issue in *T.L.O.*, or the flashlight involved here, "no less than a similar search carried out on an adult, is undoubtedly a severe violation of *** privacy." *T.L.O.*, 469 U.S. at 337-38, 83 L. Ed. 2d at 732, 105 S. Ct. at 740-41.

The majority also cannot reconcile its finding with the readily apparent reason for the search, the investigation of criminal activity. The Supreme Court has noted the importance in fourth amendment analysis of the purpose for a search, whether it was instigated in order to obtain evidence for a criminal prosecution or

for some other purpose. In *Vernonia*, for instance, the Court noted that the search was not undertaken for evidentiary purposes for criminal prosecution, and that such searches generally require probable cause. (*Vernonia*, 515 U.S. at 658 n.2, 132 L. Ed. 2d at 578 n.2, 115 S. Ct. at 2393 n.2.) In *Skinner v. Railway Labor Executives' Association* (1989), 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402, the Court stressed that government-prescribed drug testing of railroad workers was "not to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations.' " (*Skinner*, 489 U.S. at 620-21 & n.5, 103 L. Ed. 2d at 662 & n.5, 109 S. Ct. at 1415 & n.5, quoting 49 C.F.R. § 219.1(a) (1987).) And in *New York v. Burger* (1987), 482 U.S. 691, 716 n.27, 96 L. Ed. 2d 601, 623 n.27, 107 S. Ct. 2636, 2651 n.27, the Court specifically noted that there was no evidence in the record to show that an administrative inspection was a "pretext" for obtaining evidence for a criminal prosecution. The reason for the Court's concern is that a government search for evidentiary purposes for a criminal prosecution involves a more substantial invasion of privacy than a search for other purposes. See LaFave § 10.1(b), at 378-79.

It is significant that as a police officer, Ruettiger conducted the seizure and search of defendant's personal noncontraband item, the flashlight, in furtherance of his self-stated primary purpose at the school: "to take care of criminal activity." A search of a student by a school official, however, such as a teacher or principal, is conducted primarily to maintain discipline and decorum in the classroom.

Thus, the second factor of the balancing equation, the character of the intrusion complained of, also favors the standard of probable cause. This is a classic fourth amendment search in which a police officer seizes and searches a defendant's noncontraband item in order to facilitate a criminal prosecution.

(iii)

The final factor in the balance is the nature and immediacy of the governmental concern at issue, and the efficacy of the means used for meeting that concern. I agree with the majority that the State's interest in maintaining schools free from the ravages of drugs is compelling. (See *Vernonia*, 515 U.S. at 661, 132 L. Ed. 2d at 579, 115 S. Ct. at 2394.) Yet, I do not believe that this interest is sufficiently compelling, even at the Alternate School, in light of students' privacy interests *vis-a-vis* the State as law enforcer and the severe nature of the intrusion, to justify the lowering of the standard to search for a police officer in school from probable cause to reasonable suspicion. (See *Vernonia*, 515 U.S. at 661, 132 L. Ed. 2d at 579, 115 S. Ct. at 2394.) I believe this compelling interest has been met by allowing *teachers and school administrators*, who have almost constant contact with and supervision over students, the right to search students based on only reasonable suspicion.

Moreover, in addressing this issue, the *Vernonia* Court concluded that accusatory searches by school officials are more negative than random searches. (*Vernonia*, 515 U.S. at 663-64, 132 L. Ed. 2d at 581, 115 S. Ct. at 2396.) The Court noted that in the school setting, random drug testing might be more acceptable to parents than accusatory drug testing because of the stigma attached to being accused, which would "transform[ ] the process into a badge of shame." (*Vernonia*, 515 U.S. at 663, 132 L. Ed. 2d at 581, 115 S. Ct. at 2396.) In the present case, the search was accusatory.

The present search was also conducted by a police officer, and not a teacher untrained in the intricacies of fourth amendment jurisprudence and probable cause. *T.L.O.* stated that the lowered level of suspicion was proper for teachers untrained in fourth amendment jurisprudence. (See *T.L.O.*, 469 U.S. at 343, 83 L. Ed. 2d at 735, 105 S. Ct. at 743; *cf. Vernonia*, 515 U.S. at 663, 132

L. Ed. 2d at 581, 115 S. Ct. at 2396.) Police officers such as Ruettiger, however, are trained in fourth amendment jurisprudence. Thus, the lower standard is appropriate for teachers and school administrators, but not for police officers.

The majority tortures this logic by finding that because teachers and school administrators are not trained in the intricacies of the fourth amendment, police officers may patrol school hallways, searching and seizing based only on reasonable suspicion. (169 Ill. 2d at 210.) However, the Supreme Court's point is that teachers and school administrators are allowed the lowered standard because they are untrained in fourth amendment jurisprudence. Conversely, since police officers are trained in fourth amendment jurisprudence, they are required to abide by its general requirement of probable cause to search.

(iv)

Upon consideration of these three factors, I find only one, the compelling interest in protecting school children from the influx of drugs into the school that prompted the Supreme Court in *T.L.O.* and in *Vernonia* to lower the fourth amendment standard for school officials to search schoolchildren. This factor, however, is not sufficiently compelling to allow this court to lower the standard for a police officer to search a student, even a police liaison officer assigned to an alternate school, from probable cause to reasonable suspicion. More significant is the severe intrusion of a schoolchild's expectation of privacy *vis-a-vis* the State as law enforcer.

My conclusion is supported by the *Vernonia* decision, which found the most important factor in balancing the interests between the individual and the State in a school search to be the relationship between the State as searcher and the subject of the search. The State conducted the seizure and search here as law

enforcer and the standard required was probable cause. My conclusion is also consistent with the overwhelming weight of legal authority.

## Probable Cause

I note briefly that Ruettiger did not have probable cause to search defendant's flashlight. Probable cause has been defined as the presence of " 'facts and circumstances within the arresting officer's knowledge *** sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense.' " (*People v. Creach* (1980), 79 Ill. 2d 96, 101, quoting *People v. Robinson* (1976), 62 Ill. 2d 273, 276.) Ruettiger clearly did not have such information when he seized and searched defendant's flashlight.

## CONCLUSION

The majority's conclusion has been rejected by every decision addressing this issue. However, henceforth, a police officer assigned to a school whose primary duty at the school is that of a police officer, to investigate and prevent criminal activity, is now not a police officer, but a school official. The result is that local law enforcement agencies now have greater latitude to search students in school, based on the fact that they are children, and then have them charged and sentenced as adults with the evidence obtained. The majority's conclusion is a threat to the rights of all children in school to be free from unreasonable searches and seizures and from overzealous and aggressive police conduct. Children do not learn respect for their basic constitutional rights, or the rights of others, in such a setting. Instead, such a negative environment only fosters cynicism as well as suspicion of, and contempt for, all police activity.

234

I cannot join the majority's departure from logic, good sense, and established case law. Accordingly, I dissent.

JUSTICES HARRISON and McMORROW join in this dissent.