THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. BRUCE D. THOMAS, Defendant-Appellee.

Fifth District No. 5—99—0156

Opinion filed August 10, 2000.

Gary Duncan, State's Attorney, of Mt. Vernon (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Robert S. Burke, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE KUEHN delivered the opinion of the court:

William Wardlow strolled down a Chicago sidewalk carrying a white bag under his arm. He was walking in one of Chicago's "high crime neighborhoods." A caravan of four city squad cars on area patrol drove by. As the last squad car cruised past Wardlow, he exchanged glances with the officers inside and sprinted off. The officers chased him. After they caught him, they discovered a gun in his bag. Wardlow was arrested for carrying a concealed weapon.

Confronted with these facts, the United States Supreme Court recently declared that Wardlow's unprovoked flight in the face of a potential encounter with police officers raised enough suspicion to justify the ensuing pursuit and investigatory stop. See *Illinois v. Wardlow*, 528 U.S. 119, 125, 145 L. Ed. 2d 570, 577, 120 S. Ct. 673, 676-77 (2000). But what if the Chicago police officers specifically targeted Wardlow for an illegal stop and detention, and their effort to effect it precipitated his flight? Can flight induced by a police effort to effect an unwarranted investigatory stop turn otherwise ungrounded suspicion into suspicion that reasonably justifies the ultimate stop and detention? Can flight in the face of an impending illegal encounter cure the constitutionally impermissible police conduct that provokes that flight? These are questions that must be answered in this case.

The defendant, Bruce D. Thomas, and Officer Farrin Melton were old acquaintances. Officer Melton and his fellow officers on the Mt. Vernon police department came to know the defendant on the streets of Mt. Vernon, where he insisted upon plying an illegal drug trade. This was not the first time that the defendant had been arrested in possession of illegal drugs.

As the hour approached midnight on June 20, 1998, the defendant rode his bicycle down a street in Mt. Vernon. Officer Melton was completing the issuance of a traffic ticket on that same street. He watched the defendant pedal by and noticed a police scanner in the defendant's hand. Officer Melton had just heard about the defendant's recent release from prison. At the same time, he heard of an informant's tip that the defendant had already returned to his wicked ways. A confidential informant had advised the local narcotics division that the defendant was using his bicycle to make nighttime deliveries of illegal drugs to area customers.

Based upon his knowledge of the defendant's unsavory past and the informant's tip, coupled with the defendant's possession of a police scanner, Officer Melton decided that he and the defendant needed to have a brief chat. He felt that the circumstances warranted a "field interview." In order to question the defendant about his night's activities, Officer Melton had to chase after him and bring his midnight ride to a halt.[1]

---

[1]Before the trial judge, the State maintained that Officer Melton was attempting to effect an investigatory stop, supported by enough information to articulate a reasonable suspicion. On appeal, the State concedes that when Officer Melton initiated his effort to stop and question the defendant, he possessed neither probable cause to arrest nor enough information to articulate a reasonable suspicion that the defendant was engaged in any criminal activity.

When Officer Melton finished issuing the traffic ticket, he drove off to find the defendant. When he found him, he radioed Officer Steven Burtnett and announced his intention to stop the defendant. The defendant heard the communication on his police scanner. Officer Melton overtook the defendant, passed him by, and positioned his squad car across the defendant's path of travel. As Officer Melton pulled into position to stop the bicycle from pursuing its course, the defendant made an abrupt turn into an alleyway and departed the area at an accelerated pace. As Officer Melton was still behind the wheel of his squad car, he had no opportunity to verbally compel a stop.

Officer Burtnett was on his way to assist in the "field interview" when he saw the defendant's evasive change in direction. He was first to pursue the defendant down the alley. Officer Burtnett overtook the hard-pedaling bicyclist and pulled his squad car alongside. As he rolled down his window and directed the defendant to stop, the defendant changed direction again and pedaled even harder.

By this time, Officer Melton had joined the chase. Both officers employed their flashing red lights and chased the defendant through the back streets and alleys of Mt. Vernon. The defendant worked hard to escape them, but he and his bicycle proved no match for the horsepower that the officers had at their disposal. He decided to abandon his bicycle and run for the cover of darkness afforded by a vacant field. Officer Melton pursued his weary prey on foot. He caught the defendant and conducted a pat-down search. The search uncovered three rocks of crack cocaine in the defendant's pocket. Officer Melton placed the defendant under arrest.

Shortly thereafter, the State filed an information that charged unlawful possession with the intent to deliver cocaine. The defendant's attorney filed a motion to suppress, claiming a fourth amendment violation. The motion sought to suppress the cocaine that Officer Melton retrieved from the defendant's pocket. It alleged that the cocaine's discovery was the product of an unreasonable seizure of the defendant's person. At the hearing on the motion, Officer Melton admitted that he had no information that the defendant was carrying illegal drugs on the night in question. He also conceded that it was not illegal for the defendant to possess a police scanner.

After the evidentiary hearing, the trial judge entered an order suppressing the contraband. He noted that Officer Melton did not observe any criminal conduct. The defendant was simply riding his bicycle on a public street and carrying a police scanner. The informant had not told the police that the defendant's drug-dealing was a nightly activity. Nor did the informant predict drug-dealing that evening. The trial judge found that the informant's tip lacked sufficient specificity and,

even when coupled with the defendant's possession of a police scanner, failed to provide a basis for Officer Melton to believe that the defendant was actively engaged in drug-dealing. As to the suspicion aroused by the defendant's flight, the trial judge relied upon *People v. Wardlow*, 183 Ill. 2d 306, 701 N.E.2d 484 (1998). When our supreme court addressed the question of flight from police officers, it held that Wardlow's unprovoked flight was insufficient to justify a *Terry*[2] stop.

The State brought this appeal.

■ We will not overrule a trial judge's order of suppression unless it is found to be manifestly erroneous. See *People v. Dilworth*, 169 Ill. 2d 195, 201, 661 N.E.2d 310, 314 (1996). Here, there was nothing manifestly wrong with the trial judge's decision when he made it. However, prior to oral argument on appeal, the United States Supreme Court handed down its decision in *Illinois v. Wardlow*. The rule of law that controlled the question of a defendant's flight was changed. In reversing our high court, the United States Supreme Court held that unprovoked flight is the kind of nervous, evasive behavior that warrants a finding of reasonable suspicion and authorizes a *Terry* stop. See *Illinois v. Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577, 120 S. Ct. at 676-77.

The trial judge's suppression order rested upon a finding that Officer Melton effected a *Terry* stop without having the requisite degree of suspicion to support it. His finding addressed the position taken by the State at the time of the suppression hearing. At that time, the State maintained that Officer Melton's actions constituted an uninterrupted effort to effect a *Terry* stop. The State urged that from the moment he decided to stop the defendant, Officer Melton possessed a reasonable and articulable suspicion that the defendant was engaged in criminal activity. The State claimed that the defendant's flight only added to the requisite degree of suspicion that Officer Melton already possessed.

Now, the State recasts its position. The trial judge was never asked to examine the facts of this case from the perspective raised on appeal. With a new outlook on the importance of the defendant's flight, the State revisits Officer Melton's testimony at the suppression hearing and fashions its argument to conform with it.

The State now argues that the decision to effect an investigatory stop was reached only after the defendant fled. Thus, the decision to effect a seizure of the defendant's person was reached at a time when a sound basis for it existed. The State abandons the position that Officer Melton possessed enough information to justify an investigatory

---

[2]*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

stop prior to the defendant's flight. Instead, the State points to Officer Melton's claim that he only wanted to talk with the defendant. It points out:

> "'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' "[3]

The State further points out, " '[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [citations] ***.' "[4]

The State now emphasizes Officer Melton's stated purpose, to conduct a "field interview." And it assigns a meaning to this nomenclature. The State suggests that Officer Melton was describing that form of "personal intercourse between policemen and citizens" (*Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16) that does not amount to a seizure. In support of this view, the State points out that Officer Melton did not display his gun or physically touch the defendant. Nor was Officer Melton able to utter a word of direction, prior to the defendant's change in direction and exit from the point of the intended interview. The State maintains that there was nothing to demonstrate that Officer Melton intended to do anything other than talk to the defendant, which he had a perfect right to do. The State maintains that there was no show of authority.

It follows from this argument that Officer Melton's actions prior to the defendant's flight would not be the beginning of an investigatory stop that would implicate the fourth amendment. The State contends, however, that once the defendant fled the scene, his flight armed both police officers with a circumstance that justified pursuit for the purpose of executing a *Terry* stop. See *Illinois v. Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577, 120 S. Ct. at 676-77.

We find this approach untenable. Officer Melton was not trying to engage in the kind of personal intercourse between police officers and citizens that falls short of a seizure. He was trying to effect a forceful stop and detention. His use of the phrase "field interview" to describe his intent and design does not alter what he did in order to effect it. Nor does it change the investigative nature of that intent and design.

---

[3]*Florida v. Royer*, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983).

[4]*Florida v. Bostick*, 501 U.S. 429, 434-35, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991); see also *People v. Cole*, 256 Ill. App. 3d 590, 593-94, 627 N.E.2d 1187, 1189 (1994).

Officer Melton wanted to explore the possibility that the defendant was back to his old habits. He targeted the defendant for a discriminate stop and detention. Its purpose was to conduct an inquiry into the suspicions raised by the informant's tip and the defendant's possession of a police scanner. Officer Melton was interested in learning more about his suspicion, grounded in circumstances that fell short of warranting a stop—a suspicion that the defendant was engaged in specific criminal activity. Simply put, the intended "field interview" was going to be an interrogation about suspected drug dealing. Officer Melton was going to stop and detain the defendant in order to further investigate his suspicion that the defendant was up to no good.

The method employed to fulfill this investigative purpose constituted more than a mere casual approach to engage in conversation. To give effect to his intent, Officer Melton had to chase after and find the defendant. Then he had to halt the defendant's movements. When he caught up to the defendant, he did not honk his horn and wave, or roll down his window and engage in conversation. He radioed a nearby colleague to inform him of what he was about to do. He told Officer Burtnett that he was about to forcefully stop the defendant. He had no reason to contact his fellow officer other than to acquire backup assistance. Officer Melton maneuvered his squad car to effect an abrupt stop of a moving vehicle by cutting off the path ahead. This was clearly an effort to effect an investigatory stop and detention.

Contrary to the State's contention, Officer Melton's actions constituted a show of authority. While it is true that Officer Melton did not display a gun, did not utter a word, and did not physically touch the defendant, his action was sufficient to produce a feeling of freedom's restraint in an objectively reasonable person. Officer Melton sped past the defendant, made a sudden veer at a right angle to the defendant's travel route, and deployed his squad car in a manner designed to cut off the defendant's roadway. It would be quite reasonable for a motorist, or, in this case, a bicyclist, confronted with such police action to conclude that the officer wanted no further movement and expected submission. When a police officer suddenly obstructs continued movement by placing his squad car between a traveler and the road ahead, most travelers would feel compelled to stop and constrained to stay until they engaged further direction from the officer.

■ Our disagreement with the State's view of the initial encounter between Officer Melton and the defendant does not end the inquiry. We must determine whether the show of authority constituted a seizure that implicated fourth amendment protection. The defendant relies upon an oft-stated test for this question. *A person is seized*

*within the meaning of the fourth amendment when, in view of all the*
*circumstances, a reasonable person would believe that he was not free*
*to leave.* See *Royer*, 460 U.S. at 501-02, 75 L. Ed. 2d at 239, 103 S. Ct.
at 1326; *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d
497, 509, 100 S. Ct. 1870, 1877 (1980). As we have already observed,
the circumstances that confronted the defendant meet this test.

Although there was a sufficient show of authority to convey to the
defendant that he was not at liberty to leave, the defendant chose to
disregard it. His refusal to yield to Officer Melton's effort raises a fur-
ther question of whether fourth amendment protection attached at
any time prior to the defendant's apprehension. The defendant
maintains that a seizure occurs "when the officer, by means of physi-
cal force or show of authority, has in some way restrained the liberty
of a citizen." *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S.
Ct. at 1879 n.16. Under this definition, a fourth amendment seizure
clearly occurred when Officer Melton used his squad car to block the
defendant's path.

The State suggests a narrower definition, one that requires
submission to the show of authority before fourth amendment protec-
tion can attach. It argues that there was no seizure of the defendant's
person until the officers physically arrested his flight.

The State finds support for this position in *California v. Hodari
D.*, 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991). The facts
of *Hodari D.* are remarkably similar to *Illinois v. Wardlow*. Oakland
city police officers, patrolling a "high crime neighborhood," ap-
proached a gathering of natives on a street corner. See *Hodari D.*, 499
U.S. at 622-23, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. A mass exodus
ensued. See *Hodari D.*, 499 U.S. at 623, 113 L. Ed. 2d at 695, 111 S.
Ct. at 1549. Suspects ran in all directions, but the police targeted and
chased after Hodari D. The *Illinois v. Wardlow* interpretation of flight
was still a decade off. Thus, the officers lacked any known basis to
justify a seizure of Hodari D.'s person. However, just before he was
tackled by one of the officers, Hodari D. discarded cocaine. See *Hodari
D.*, 499 U.S. at 623, 113 L. Ed. 2d at 695, 111 S. Ct. at 1549. He
provided probable cause for arrest just before he hit the ground. Ho-
dari D. was untouched by any officer at the moment of the cocaine's
release. See *Hodari D.*, 499 U.S. at 625, 113 L. Ed. 2d at 697, 111 S.
Ct. at 1550.

Hodari D. construed a fourth amendment "seizure" in a manner
familiar to our case. He relied upon the proposition that a seizure oc-
curs " 'when the officer, by means of physical force or show of author-
ity, has in some way restrained the liberty of a citizen.' " (Emphasis
omitted.) *Hodari D.*, 499 U.S. at 625, 113 L. Ed. 2d at 697, 111 S. Ct.

at 1550, quoting *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16. He argued that the officers' pursuit constituted a show of authority that called upon him to cease running. See *Hodari D.*, 499 U.S. at 625-26, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550. Based upon this view, Hodari D. claimed that he was seized for purposes of the fourth amendment prior to the cocaine's release, and its discovery was, therefore, the product of an unlawful police seizure. See *Hodari D.*, 499 U.S. at 626, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550.

The United States Supreme Court accepted Hodari D.'s claim that the police pursuit conveyed a show of authority that called for submission. Hodari D. knew, as any objectively reasonable person would know, that the police wanted to halt his further movement. The Court thus confined the issue as follows:

> "The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not." *Hodari D.*, 499 U.S. at 626, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550.

The Court found Hodari's claim baseless:

> "The language of the Fourth Amendment, of course, cannot sustain respondent's contention. The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ('She seized the purse-snatcher, but he broke out of her grasp.') It does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Hodari D.*, 499 U.S. at 626, 113 L. Ed. 2d at 697, 111 S. Ct. at 1550.

Justice Scalia, author of the majority opinion, disclaimed any departure from the following test formulated in *Mendenhall*, " '[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Hodari D.*, 499 U.S. at 627-28, 113 L. Ed. 2d at 698, 111 S. Ct. at 1551, quoting *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; see also *Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.

Justice Scalia wrote:

> "In seeking to rely upon that test here, respondent fails to read it carefully. It says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.' " (Emphasis in original.) *Hodari D.*, 499 U.S. at 628, 113 L. Ed. 2d at 698, 111 S. Ct. at 1551.

Scalia concluded that Hodari D. was not seized until he was tackled. See *Hodari D.*, 499 U.S. at 629, 113 L. Ed. 2d at 699, 111 S. Ct. at 1552. This conclusion rested upon Hodari D.'s refusal to submit to the show of authority. Thus, the case stands for a proposition that supports the State in this appeal. A necessary show of authority under the *Mendenhall* test does not end the inquiry into whether a fourth amendment seizure has occurred. *The police may well convey a reasonable feeling of restraint, but that message does not amount to a seizure within the meaning of the fourth amendment until there is submission to it. A person must submit to a show of authority before that show of authority can constitute a seizure.* Here, the defendant was not seized by Officer Melton's attempted roadblock because he refused to halt and, instead, chose to run. He was seized only when physical force was applied after he was caught.

Had the defendant stopped when his path was obstructed, had he submitted to Officer Melton's show of authority, a seizure of the kind offensive to our constitution would have occurred. Officer Melton would have effected an investigatory stop absent the requisite degree of suspicion to support it. The stop would have constituted an unreasonable seizure of the defendant's person. However, Officer Melton's attempt to effect an unlawful stop did not implicate the fourth amendment because the defendant took flight and prevented it.

■ This leads us to the unique questions that this appeal raises. We must decide whether the defendant's ultimate stop and detention through the application of physical force was an unreasonable seizure of the defendant's person, given Officer Melton's unsuccessful, yet unlawful, initiative. Can the defendant's flight, induced by Officer Melton's effort to effect an unwarranted investigatory stop, turn Officer Melton's otherwise ungrounded suspicion into a suspicion that justifies the defendant's ultimate stop and detention? We think that it can. Can the defendant's flight to prevent an impending illegal stop and detention cure the constitutionally impermissible conduct that provoked his flight? For purposes of the exclusionary rule's application, we think that it can.

As Justice Scalia observed in *Hodari D.*:

"Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones[,] it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command 'Stop!' expecting

to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures." (Emphasis in original.) *Hodari D.*, 499 U.S. at 627, 113 L. Ed. 2d at 698, 111 S. Ct. at 1551.

We think that this reasoning makes sense under the circumstances presented in this case. We refuse to apply a rule of exclusion to sanction Officer Melton's *attempt* to effect an unconstitutional investigatory stop. It simply does not serve a legitimate purpose to suppress evidence where an unlawful show of authority was not submitted to and, instead, precipitated headlong flight indicative of criminal activity.

We choose to examine Officer Melton's basis for a seizure of the defendant's person at that point in time when he was successful in effecting it. By that time, Officer Melton's ungrounded suspicion had ripened into suspicion that fully warranted an investigatory stop. The defendant's history, his possession of a police scanner, and the informant's tip was information that grew more credible with each evasive turn that the defendant took in his effort to outrun two squad cars. The defendant's desire to avoid an encounter with the police was so great that he was willing to place the public's safety, as well as his own safety, at risk. He was even willing to abandon his bicycle and police scanner in the hope of escaping. The defendant's response to Officer Melton's unsuccessful effort escalated into headlong flight, a consummate act of evasion. It credited other information that Officer Melton possessed and gave rise to an articulable suspicion that criminal activity was afoot. Therefore, the defendant's ultimate stop and detention was legal and proper. A subsequent pat-down search was permissible and did not violate the fourth amendment.

We caution that our decision is not a license to conduct investigatory stops and pat-down searches in every instance where a citizen ignores, or fails to heed, a baseless police order or show of authority. Justice Scalia correctly pointed out that since people lack the means to decipher legitimate police orders from groundless ones, it is prudent for people to obey all of them. See *Hodari D.*, 499 U.S. at 627, 113 L. Ed. 2d at 698, 111 S. Ct. at 1551. However, people do have a right to go about their business, and if they choose to do so, their choice does not authorize a subsequent stop and detention. See *Royer*, 460 U.S. at 497-98, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324. The circumstances in this case are a far cry from the person who is targeted for an unwarranted stop and detention and responds with disdain: "I do not have time for this. Unless you have reason to hold me here, I am going to leave."

There are two circumstances key to today's decision. First, Officer Melton did not act without reason or for the sole purpose of provoking

the defendant's flight. He acted on information that he believed warranted further investigation. While it may not have been sufficient to form the basis of a reasonable suspicion, it was sufficient to clothe his effort in good faith. Second, the defendant's response to his endeavor was nothing short of headlong flight. The defendant's reaction was in no way ambiguous. There was nothing to suggest that the defendant was merely exercising the right to continue on his way or to cause confusion between the exercise of that right and a pure act of evasion.

For the reasons stated, we reverse the suppression order and remand for further proceedings.

Reversed and remanded.

GOLDENHERSH, P.J., and RARICK, J., concur.