**FIRST DIVISION
SEPTEMBER 28, 2007**

No. 1-05-3499

| | | |
|---|---|---|
| *In re* MARIO T., a Minor | ) | Appeal from the |
| (The People of The State OF Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05 JD 4426 |
| | ) | |
| Mario T., | ) | Honorable |
| | ) | Lori M. Wolfson, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

Following a hearing, the respondent Mario T. was adjudicated delinquent based on his possession of cocaine and cannabis, and sentenced to one year's probation. On appeal, the respondent contends that the trial court erred in denying his pretrial motion to quash arrest and suppress evidence. We agree and reverse.

BACKGROUND

Prior to the adjudicatory hearing, the respondent filed a motion to quash arrest and suppress evidence. The respondent alleged that the police lacked justification for a protective pat-down search that resulted in the recovery of illegal drugs.

1-05-3499

At the suppression hearing, Chicago police officer Hickey testified that at 8 p.m. on July 18, 2005, she and her partner went to 2964 S. State Street in response to a radio call that three males were breaking into a vacant unit on the second floor of the building. The officers proceeded to the second floor by separate stairways to investigate. Upon reaching the second floor of the six-story Chicago Housing Authority building, Officer Hickey and her partner observed four males "loitering"[1] in the hallway.

Officer Hickey testified that after observing the group for a "few seconds," she decided to conduct a field interview to determine "if they lived in the vicinity or in the building." Officer Hickey learned that they did not live in the 2964 building and that the respondent lived in apartment 406 of the 2940 S. State building. Fearing for her safety, Officer Hickey "performed a protective pat-down" by feeling around the respondent's waistline and pocket to ensure that he was unarmed. As she felt his front pocket, Officer Hickey "felt several small

_____

[1] We take the officer's testimony of the group's "loitering" in the hallway as being descriptive of their activity and not suggestive of any criminal acts on their part, especially where neither the State nor the trial court expressed reliance on the use of that word.

- 2 -

rock like objects." When she asked the respondent what it was, the respondent told her it was "rocks." Officer Hickey understood "rocks" to be crack cocaine. She then removed 26 rocks of suspected crack cocaine from the respondent's pocket, placed him into custody, and performed a second custodial search which revealed four Ziplock baggies of suspected marijuana.

Officer Hickey testified that she feared for her safety because the 2964 building is known as an area of high narcotics and gang activity and, in her experience, weapons are often associated with drug offenses. Officer Hickey testified that she had been a Chicago police officer for five years and had made 50 to 100 narcotics arrests. She had made 10 to 20 arrests at this address. She estimated she had made 10 to 20 arrests where both drugs and weapons were involved.

Regarding the timing of the pat-down in relation to the field interview, Officer Hickey testified "Yeah, after I spoke with him, yes, I patted him down while I was speaking with him." The respondent was cooperative; he did not attempt to run away nor did he make any threatening gestures.

The respondent testified that he was on his way to his sister's apartment on the fifth floor of the 2964 S. State Street building when police stopped him and his three friends on the second floor. The respondent said that the police "put us on the

wall and went in our pockets" and found "weed and rocks" in his pocket. The respondent testified that he told the police at the beginning of the encounter that he was on his way to visit his sister.

In support of the motion, defense counsel argued: "Under the State's Attorney's theory, then everyone that lives there at any point is subject[] to a reasonable search and seizure by the officers because going by that theory, anyone that lives in that area is under suspicion based on the fact that they simply live there."

As to its reasoning for denying the respondent's motion to quash arrest and suppress evidence, the trial court stated:

> "[Based] on the officer's experience and
> based on the circumstances, the circumstances
> being two officer[s] alone in a hallway with
> four males. The circumstances being the
> experience that this officer has regarding
> drugs and investigations in areas where drugs
> are prevalent, the officer's experience with
> guns, the [Terry] analysis and search
> analysis is not a two-prong analysis, it's
> three-prong analysis of whether [there's]
> sufficient basis for the stop. Second,

whether there's a sufficient basis for a limited search. And third, whether there's a sufficient basis for a weapons frisk. I believe it was a limited search on the officer's reasonable belief that they could be in danger. The articulated facts that made her concern[ed] for her safety ***, a limited search to determine whether the minor had any weapons [by] which she could be harmed. * * * I do believe that she had a right to make a limited search [under] the circumstances of the case ***."

An adjudicatory hearing ensued wherein the parties stipulated to the evidence presented at the suppression hearing. The parties also stipulated that Nancy McDonagh, a forensic chemist with the Illinois State Police crime lab, would testify that the recovered items tested positive for cocaine and cannabis. She estimated the cocaine weighed 15 grams and the cannabis weighed .5 grams. The parties further stipulated that a proper chain of custody was maintained at all times. The court found the respondent delinquent and sentenced him to probation for one year. The respondent renewed his motion to quash arrest and suppress evidence posttrial, which the court denied.

ANALYSIS

A.  Initial Encounter

On appeal, the respondent concedes that the initial encounter was lawful, but contends that the subsequent search was not.  The State contends that based on the respondent's concession that the "stop" was lawful, we need only examine the subsequent frisk to determine whether the officer's action was justified.  While we agree that the initial encounter between the respondent and the officers was lawful, this is so because it was not a "stop" under Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).  Rather, it was a "third tier" encounter between officers and citizens involving no coercion or detention and hence no implication of fourth amendment interests.  See People v. Luedemann, 222 Ill. 2d 530, 544, 857 N.E.2d 187 (2006) (three tiers of police-citizen encounters: (1) arrests, requiring probable cause; (2) Terry "stops," requiring reasonable, articulable suspicion of criminal activity; and (3) encounters without "coercion or detention and thus do not implicate fourth amendment interests").  Officer Hickey testified that after viewing the respondent and his companions for a "few seconds," she and her partner approached the respondent for a "field interview."  According to Officer Hickey her intent in speaking with the group was to determine "if they lived in the vicinity or

in the building."  Thus, it does not appear that the purpose in conducting the field interview was to conduct a forceful stop. At its inception, the field interview did not involve coercion or detention.  See People v. Thomas, 315 Ill. App. 3d, 849, 853, 734 N.E.2d 1015 (2000), aff'd 198 Ill. 2d 103, 759 N.E.2d 899 (2001) (officer's "intent and design" in encounter with citizen gives meaning to the term "field interview").

However, sometime in the course of speaking to the respondent, Officer Hickey patted him down, which resulted in the discovery of the cocaine.  Once Officer Hickey began the protective pat-down, it changed the fundamental nature of the encounter from a consensual one into a full-blown Terry stop. See generally  People v. Gonzalez, 204 Ill. 2d 220, 789 N.E.2d 260 (2003).  Thus, the "stop" and the  "frisk" occurred simultaneously.  See Florida v. J.L., 529 U.S. 266, 146 L. Ed. 2d 254, 120 S. Ct. 1375 (2000); People v. F.J., 315 Ill. App. 3d 1053, 734 N.E.2d 1007 (2000); In re S.V., 326 Ill. App. 3d 678, 761 N.E.2d 248 (2001).  We analyze the "stop and frisk" from the point of the pat-down to determine whether the police action was justified under Terry.

### B. Standard of Review

Mixed questions of law and fact are presented upon review of an order denying the respondent's motion to quash arrest and

1-05-3499

suppress evidence. People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d 93 (2004). We will not disturb the trial court's findings of historical fact unless they are against the manifest weight of the evidence. Pitman, 211 Ill. 2d at 512. With the trial court's findings of historical fact in mind, we review de novo the trial court's ultimate legal ruling as to whether suppression is warranted. Pitman, 211 Ill. 2d at 512.

The respondent contends that because he does not challenge the substance of Officer Hickey's testimony, this case presents a legal rather than a factual question, and the standard of review should be de novo, citing People v. Dilworth, 169 Ill. 2d 195, 201, 661 N.E.2d 310 (1996). However, Dilworth was decided before our supreme announced its decision in People v. Sorenson, 196 Ill. 2d 425, 430-31, 752 N.E.2d 1078 (2001), to follow the federal standards set out in Ornelas v. United States, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). "[W]e will accord great deference to the trial court's factual findings, and we well reverse those findings only if they are against the manifest weight of the evidence; however, we will review de novo the ultimate question of the defendant's legal challenge to the denial of his motion to suppress." Sorenson, 196 Ill. 2d at 431.

While we question whether the application of either standard of review as to the historical facts would make any difference in

the disposition we reach, we see no reason to apply a standard of review other than manifest weight of the evidence even where the testimony in the State's case is essentially uncontested on appeal.  This we believe is consistent with the deference to be accorded to the trial court's findings reviewed in light of the trial court's ultimate determination denying the respondent's motion.  Our focus instead is on the legal question of the justification of the stop and frisk so as to warrant the denial of the respondent's motion to suppress, a ruling we review de novo.  Independent appellate review of the ultimate decision to deny relief is appropriate, at least in part, because "'de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined "set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement."'"  In re G.O., 191 Ill. 2d 37, 47, 727 N.E.2d 1003 (2000), quoting Ornelas, 517 U.S. at 697-98, 134 L. Ed. 2d at 919-20, 116 S. Ct. at 1662, quoting New York v. Belton, 453 U.S. 454, 458, 69 L. Ed. 2d 768, 773, 101 S. Ct. 2860, 2863 (1981).  "A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional

imprimatur."  Terry v. Ohio, 392 U.S. at 13, 20 L. Ed. 2d at 901, 88 S. Ct. at 1875.  In this regard, whether the motion should have been granted necessarily turns on a reviewing court's "own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted."  Pitman, 211 Ill. 2d at 512.

### C.  Stop and Frisk

At the start of the pat-down, it seems clear that what started as a consensual encounter was converted into a "stop and frisk" as such an encounter has become known since Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).  To justify the protective pat-down by Officer Hickey, the State asserts: "A reasonably prudent person who found himself outnumbered by individuals found loitering in the hallway of a building known for narcotics, weapons and gangs on the floor where there was a recent report of individuals breaking into an apartment and the loitering individuals did not live in the building would have believed he was in danger."  Thus, the State relies upon five factors to justify the police action in this case: (1) the officers were outnumbered; (2) the building was a high crime and gang activity area; (3) the recent report of criminal activity; (4) the respondent did not live in the building; and (5) the stated fear of Officer Hickey for her safety based on the

cumulative effect of those factors.  While the stop and frisk
occurred simultaneously, the respondent only raises a challenge
to the legality of the "frisk."  We therefore only examine the
cited factors in the context of the lawfulness of the search.
See People v. Sorenson, 196 Ill. 2d 425, 752 N.E.2d 1078 (2001)
(challenge to frisk only); People v. Galvin, 127 Ill. 2d 153,
164, 535 N.E.2d 837 (1989) (stop valid, search not valid); People
v. Rivera, 272 Ill. App. 3d 502, 506-07, 650 N.E.2dd 1084 (1995)
(stop justified, search not justified).  We set out the full
circumstances of the respondent's seizure and search as part of
the totality of the circumstances that was presented to the trial
court.

Burden of Proof

Before we discuss the factors cited by the State in support
of the trial court's denial of the suppression motion, it is
important to establish the respective burdens in the context of a
Terry challenge.

At the suppression hearing, the respondent was called to
establish his prima facie case that he was doing nothing unlawful
at the time he was stopped and frisked.  This he successfully did
as the trial court denied the State's motion for a directed
finding after the respondent testified.  "The burden of
production then shifted to the State to provide the specific and

articulable facts from which the officer reasonably inferred that [the minor] was involved in criminal activity." People v. F.J., 315 Ill. App. 3d at 1057. In other words, "[o]nce a defendant challenges a warrantless search, it becomes the State's burden to show that the search" is constitutional. People v. Rushing, 272 Ill. App. 3d 387, 390, 649 N.E.2d 609 (1995). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967). " '[T]he burden is on those seeking the exemption to show the need for it.' " Coolidge v. New Hampshire, 403 U.S. 443, 455, 29 L. Ed. 2d 564, 576, 91 S. Ct. 2022, 2032 (1971) quoting United States v. Jeffers, 342 U.S. 48, 51, 96 L. Ed. 59, 64, 72 S. Ct 93, 95 (1951). One such exception "is the pat-down search recognized by the Supreme Court in Terry v. Ohio, 392 U.S.1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)." People v. Moss, 217 Ill. 2d 511, 518, 842 N.E.2d 699 (2005). Thus, it was the State's burden to justify the pat-down search of the respondent.

### 1. The Radio Call

The State first sought to justify the pat-down search by revealing why the officers were at the location. The State

elicited from Officer Hickey that she and her partner were at that location based on a radio call regarding an attempted burglary by four males on the second floor of the building. Based on the record before us, the radio call did not contain any description of the individuals involved. There was no evidence adduced regarding when the information was provided to the police in relation to when the radio call was sent to the investigating officers. The record is also barren of any evidence that the officers upon arriving on the second floor conducted any investigation to determine the accuracy of the radio call. No testimony was elicited regarding, for example, an apartment door being ajar, pry marks on an entry door, or any other indication that a force was applied to any of the second-floor unit doors to gain entry. In other words, nothing Officer Hickey observed provided a reason to suspect the respondent and his companions were involved in any attempted break-in of a vacant second-floor unit.

Whether the radio call was based on information by a private citizen that identified himself or herself, or a purely anonymous call, whose reliability may be questioned by its very anonymity, we do not know. In fact, based on the record before us, we do not know whether there was any evidence of criminal activity suggesting an attempted break-in beyond the information contained

in the call itself.[2]

Nevertheless, whether the broadcast was "anonymous" as that term is used in search and seizure law,[3] we need not determine because the contention of the defendant is not with his initial stop but with the pat-down for weapons that occurred. In that context, although we may question whether anything more than an anonymous report served as the basis for the officer's stop at the point she began the pat-down, we need only determine whether there was justification for the pat-down itself under Terry. As the radio call did not contain any information to suggest that the individuals allegedly involved in the attempted break-in posed a threat to the responding officers, the radio call, itself, does not provide any basis to reasonably suspect that

---

[2] This leads us to wonder whether the call was based on observed conduct suggesting criminal activity or simply as a means of extracting the young men from a place where they were not wanted to the extent they were the subject of the call.

[3] See Florida v. J.L., 529 U.S. 266, 275, 146 L. Ed. 2d 254, 263, 120 S. Ct. 1375, 1381 (2000) (Kennedy, J., concurring) ("If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable").

Officer Hickey or her partner was in danger of attack upon encountering the respondent and his companions so as to warrant the search of the respondent's person for weapons.[4]  See People v. Galvin, 127 Ill. 2d at 173 (no legal presumption that a burglary suspect is armed and dangerous); 725 ILCS 5/108-1.01 (West 2004) (authorizing a Terry "frisk" based on reasonable suspicion of danger of attack).  We also note that based on the findings articulated by the trial court, it appears the trial court made no finding that the radio call that brought the officers to the 2964 building provided anything more than a

---

[4] This situation must be distinguished from a situation where the police officer testifies that a suspect aroused her suspicion based on her observations of the suspect, and so justifies a stop and frisk.  In the latter case, "the courts can weigh the officer's credibility and admit evidence seized pursuant to the frisk even if no one, aside from the officer and the defendant themselves, was present or observed the seizure." Florida v. J.L., 529 U.S. 266, 274, 146 L. Ed. 2d 254, 263, 120 S. Ct. 1375, 1381 (2000) (Kennedy, J., concurring).  However, Officer Hickey did not testify to anything the respondent did to arouse her suspicion, except perhaps being present on the second floor.

reason for their presence. The trial court made no finding of "criminal activity afoot" as the State argued during the motion proceedings. Rather, the trial court's ultimate decision to find the limited search of the respondent to be justified was based on the officer's drug arrest experience in the building, the unassailable connection between drugs and weapons, and, apparently, her stated "fear" of harm in the presence of four males.

As we noted above, there was no testimony elicited from Officer Hickey regarding any investigation to confirm an attempted break-in. Thus, in terms of the absence of evidence of an actual crime, this case is not unlike People v. Flowers, 179 Ill. 2d 257, 688 N.E.2d 626 (1997). In Flowers, the police stopped the defendant because they were investigating a "'possible burglary.'" Flowers, 179 Ill. 2d at 261. The defendant in Flowers was frisked because, as the appellate court observed, "in this society," the investigating officer's "caution" was warranted. Flowers, 179 Ill. 2d at 261. In assessing whether the frisk for weapons was justified under Terry, the supreme court noted, "[A]t the time defendant was stopped, [the investigating officers] had already investigated and found no evidence that the possible crime reported by the anonymous caller had been committed or attempted." Flowers, 179

Ill. 2d at 265.  See <u>People v. Sorenson</u>, 196 Ill. 2d at 437 ("By the time of the frisk in <u>Flowers</u>, the officers had already investigated the report of a possible crime and had determined that no crime had occurred").

Here, the situation is similar to that present in <u>Flowers</u> in that there is nothing in the record to indicate that any investigation conducted by Officer Hickey and her partner revealed "evidence that the possible crime reported by the *** caller had been committed or attempted." <u>Flowers</u>, 179 Ill. 2d at 265.  We see no reason to support treating a lack of investigation by police more favorably than an investigation that fails to disclose that a crime has occurred.  But, because our holding turns on the search of the respondent rather than on the justification for the stop, we examine the other factors to determine whether they support the weapons frisk of the respondent.

### 2.  High Crime Area

Officer Hickey's testimony regarding her experience of many prior arrests in the building (of course, not involving the respondent or his companions) added little to any particularized threat posed by the respondent and his companions.  While Officer Hickey testified that she had made numerous drug arrests in the 2964 building, many of which involved persons with weapons, as

defense counsel made clear in her questioning, Officer Hickey did not "go there specifically for any type of narcotics surveillance."  See People v. Rivera, 272 Ill. App. 3d 502, 506, 650 N.E.2d 1084 (1995) (claim that "narcotic arrests often *** involve weapons" rejected as sufficient to automatically justify a frisk).  Nor did Officer Hickey testify to observing any behavior by the respondent or his companions to arouse her suspicion as to possible narcotics trafficking.  In short, the respondent's presence in the 2964 building (even if properly characterized as a high narcotics area), was no different from the presence of others the officers may have encountered in the building.  Officer Hickey's experience that the 2964 building was a "high crime area," while providing a basis for her heightened caution, by itself, is an insufficient basis for a reasonable suspicion.  Illinois v. Wardlow, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime");  People v. Moorman, 369 Ill. App. 3d 187, 193, 859 N.E.2d 1105 (2006).  If the respondent's presence in a building, where narcotics trafficking may be high, does not provide a reasonable basis to support an inference that criminal activity is afoot, it necessarily follows that his

presence in such a high narcotics area provides no basis for a Terry search. See People v F.J., 315 Ill. App. 3d at 1059-60 (absent facts to warrant a stop, protective search also lacks a constitutionally sufficient basis).

### 3. Respondent Not a Resident of 2964 Building

There is no question that the respondent did not reside at the 2964 building. The respondent testified that he and his companions were on their way to visit his sister, who resided on the fifth floor of the 2964 building. No contrary information was presented. Officer Hickey never testified that the respondent did not inform her that he was on his way to his sister's apartment. Consequently, there is no conflict between the testimony of the respondent and Officer Hickey on this point. Officer Hickey was correct that the respondent did not reside in the building, but there is nothing to call into question the respondent's statement that his sister lived in that building and he and his companions were on their way there to visit. Our own assessment of this fact in relation to the issue before us leads us to conclude that it added little to the claimed justification of the weapons frisk on the respondent. See Pitman, 211 Ill. 2d at 512 (a reviewing court is free to make its own assessment of the facts in relation to the issues presented).

### 4. Officers Outnumbered

Being outnumbered is a factor to consider in assessing the safety concerns of an officer. See Sorenson, 196 Ill. 2d at 437. However, more is required than merely counting heads. An officer must "reasonably suspect[] that he *** is in danger of attack, [before] he may search the person for weapons." 725 ILCS 5/108-1.01 (West 2004). In Sorenson, the officer explained that he faced three occupants of a vehicle, on a dark and isolated road; the defendant was seen entering and quickly exiting a known drug house and posed the "quickest threat" to the officer; and "persons involved with illegal drugs are known to carry weapons." Sorenson, 196 Ill. 2d at 437. No similar circumstances are present in this case.

Even from the position that the officers may have been justified in conducting a Terry stop of the respondent based on (1) the radio call of an attempted break-in, (2) his presence on the second floor when his sister lived on the sixth, (3) not being a resident of the building, and (4) the characterization of the building as an area of high narcotics and gang activity, these factors fail to inform us as to any reasonable inference of criminal conduct on the part of the respondent and his companions, that put the officers in reasonable apprehension of an attack. A showing beyond that which is required for an investigatory stop must be made to justify a weapons frisk. See

People v. Galvin, 127 Ill. 2d at 165; compare In re S.V., 326 Ill. App. 3d 678 (2001).

This case is unlike S.V., where the investigating officers responded to multiple calls of gunshots at a particular gang-infested location. The calls also claimed that the shots were fired in the course of a "gang fight." The investigating officers observed the minor and his companions flashing gang signs of the controlling gang in the area at passing motorists. The minors were also observed walking away from the location of the "shots fired" calls. Based on these facts, and the perceived evasive reaction by the minors, the officers were justified in the inference they drew that the minors were involved in criminal activity and " 'were armed and presently dangerous.' " S.V., 326 Ill. App. 3d at 685, quoting Terry v. Ohio, 392 U.S. at 24, 20 L. Ed. 2d at 908, 88 S. Ct. at 1881.

Unlike in S.V., the crime investigated here was an "attempted break-in." There was no information that guns or weapons were present in the course of the attempted break-in. There was no activity directly observed by the officers, at least according to Officer Hickey's testimony, that might have raised the officers' suspicion that the respondent was armed and dangerous. In fact, unlike in S.V., we question whether a reasonable inference can be drawn on the facts known to Officer

Hickey that the respondent and his companions were involved in the crime being investigated. As the S.V. court cautioned: "Terry clearly does not permit police officers to routinely frisk individuals, without concern for whether a particular person poses a danger." (Emphasis added.) S.V., 326 Ill. App. 3d at 686, 761 N.E.2d 248. In S.V., based on what the officers knew and what they observed, it was reasonable to suspect that the minor was involved in the gang shootings and, from that it necessarily followed, that he posed a threat to the investigating officers as possibly armed. We see no basis to draw a similar conclusion as to the respondent here. Compare People v. F.J., 315 Ill. App. 3d 1053 (no justification for stop and frisk based on officer's observation that defendant placed unknown object in his pocket as officer approached following a "gang disturbance" call).

This case is closer to F.J. than to S.V. In fact, to the extent F.J. concerned a hand movement by the respondent that might indicate the concealment of some object in his pocket that could serve as a weapon, the case before us provides less of a showing for the frisk.

### 5. Officer's Fear for Her Safety

The State places the greatest weight for justification of the frisk on Officer Hickey's testimony that she felt in fear for

her safety. "In the case of a self-protective search for weapons, [an officer] must be able to point to particular facts from which [s]he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64, 20 L. Ed. 2d 917, 935, 88 S. Ct. 1889, 1903 (1968). We are mindful that in determining whether the officer acted reasonably under the circumstances, "due weight must be given to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of [her] experience." S.V., 326 Ill. App. 3d at 684. In accordance with the deference owed to the officers, the question becomes: "What inferences did Officer Hickey draw from the facts as she understood them to exist, in light of her experience, to support her claim that she acted reasonably in such circumstances?"

We have scoured the record to discover what in particular about the respondent and his friends made Officer Hickey reasonably suspect they posed a danger to her. We are left without an objective answer. The record also provides no testimony from Officer Hickey as to the inferences she drew about the respondent and his companions. We can draw no reasonable inferences on her behalf. Officer Hickey did mention the numerous arrests for drugs in the building where the respondent was stopped and the likely presence of weapons in drug-related

arrests. However, as we have already noted, the officers were not there investigating drug activity. Nor did Officer Hickey testify to anything the respondent or his friends did to arouse her suspicion that the respondent was involved in illicit drugs. That in Officer Hickey's experience there is often a connection between weapons and drug offenses provides no support for her claim of danger posed by the respondent as the drugs on the respondent were not discovered until <u>after</u> the frisk. See <u>Florida v. J.L.</u>, 529 U.S. at 271, 146 L. Ed. 2d at 260, 120 S. Ct. at 1379 ("reasonableness of official suspicion must be measured by what the officers knew before they conducted their search").

Nonetheless, "the officer's subjective belief regarding the safety of the situation is one of the factors that may be considered in determining whether a weapons frisk was valid under <u>Terry</u>. [Citation.]" <u>People v. Flowers</u>, 179 Ill. 2d 257, 264, 688 N.E.2d 626 (1997). Without discounting the officer's testimony that she "feared for her safety," her "subjective belief" must have an evidentiary basis in the record to allow it to be "measured against any standard of objective reasonableness." <u>People v. Galvin</u>, 127 Ill. 2d at 167. The test remains an objective one. <u>People v. Galvin</u>, 127 Ill. 2d at 167. Unfavorable results would certainly occur were it a subjective

test.  "[I]f a police officer may always search any suspect validly stopped pursuant to Terry v. Ohio by invoking a subjective fear which will not be measured against any standard of objective reasonableness based on the totality of the circumstances known to the officer at the time of the search, then the officer would effectively be able to insulate his or her actions from the constitutional safeguards guaranteed to individuals under the fourth and fourteenth amendments."  People v. Galvin, 127 Ill. 2d at 167.

We also note, as in Galvin, Officer Hickey "was never asked to specifically state what reasons existed which would lead a prudent person to reasonably believe that in the circumstances which existed at the time of the search, an officer would be warranted in the belief that his safety or that of others was in danger."[5]  People v. Galvin, 127 Ill. 2d at 168-69.  As in Galvin, Officer Hickey provided a one-word answer - "yes" - to whether she was in fear for her safety at the time she did her "protective pat-down of the minor respondent."  Under Galvin, a

_____

[5] Officer Hickey was asked whether she "had any reason to suspect that [the respondent] was armed in any way."  The trial court, however, sustained the State's objection that the question called "for speculation" and, thus, may have prevented Officer Hickey from explaining her actions.

simple answer of "yes" by the investigating officer "does not rise to the level of specific and articulable facts necessary to justify a search for weapons." People v. Galvin, 127 Ill. 2d at 169. Neither the historical facts nor the arguments put forth by the State support converting Officer Hickey's subjective fear into an objectively reasonable concern for her safety. We are also mindful of the concern expressed by defense counsel were we to find otherwise: "[E]veryone that lives there at any point is subject[] to a reasonable search and seizure by the officers ***" based upon an officer's fear for his or her safety because the building is characterized as a "high crime area." Such a holding would effectively "insulate [an officer's] actions from the constitutional safeguards guaranteed to individuals under the fourth and fourteenth amendments." Galvin, 127 Ill. 2d at 167. It would "set in motion an intrusive, embarrassing police search" simply by being a resident of a high crime area where the officer's presence puts him or her in fear for his or her safety. Florida v. J.L., 529 U.S. at 272-73, 146 L. Ed. 2d at 261-62, 120 S. Ct. at 1379-80 (concern expressed in the context of rejecting the "firearm exception" to the standard Terry analysis because such an exception would lead to giving police "discretion to frisk based on bare-boned tips about narcotics" in light of the nexus between large quantities of drugs and the presence of

1-05-3499

weapons).

Officer Hickey had to perceive, in the conduct she observed and in light of the circumstances she was presented with, a basis to reasonably conclude that the respondent "might be armed and dangerous." S.V., 326 Ill. App. 3d at 687. We find no such justification in the record. As the Supreme Court noted in Terry: "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of the particular search or seizure in light of the particular circumstances." Terry at 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880. What amounted to no more than a subjective fear on the part of Officer Hickey was an inadequate basis to conclude that her action to protect herself by conducting a weapons frisk on the respondent was reasonable. The intrusion of the weapons frisk of the respondent was not constitutionally permissible under Terry.

D.  Trial Court's Terry Analysis

Finally, the trial court based its decision in part on its understanding of a Terry analysis.

"[T]he [Terry] analysis and search analysis is not a two-prong analysis, it's a three-

- 27 -

prong analysis of whether [there's]
sufficient basis for the stop.  Second,
whether there's a sufficient basis for a
limited search.  And third, whether there's a
sufficient basis for a weapons frisk."

The trial court concluded that under the circumstances present here, "a limited search [was justified] on the officer's reasonable belief that they could be in danger."

The trial court was wrong in its understanding.  A "limited search" is a "weapons frisk" under Terry.  There is no "three-prong analysis" under Terry.  "[An officer] is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (Emphasis added.)  Terry at 392 U.S. at 30, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884-85.  There is no search more limited than a weapons frisk under Terry.  "Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." Ybarra v Illinois, 444 U.S. 85, 93-94, 62 L. Ed. 2d 238, 247, 100 S. Ct. 338, 343 (1979).

The trial court's own assessment that the circumstances of the stop and frisk justified no more than a "limited search"

raises the question whether the trial court rejected the circumstances as being sufficient to warrant a "weapons frisk" under her three-prong analysis. Nonetheless, we rely on our assessment of the facts in reaching our holding that the intrusion of a weapons search on the respondent was not justified.

CONCLUSION

Accordingly, we find that the circuit court erred in denying the respondent's motion to quash arrest and suppress evidence. Under the facts of this case, the sum of the five factors relied upon by the trial court is no greater than the weight to be given to each individual factor. Under the totality of the circumstances in this case, the relief sought by the respondent should have been granted.

Reversed and remanded.

McBRIDE, J., concurs.

CAHILL, J., dissents.

PRESIDING JUSTICE CAHILL, dissenting:

I respectfully dissent. I believe the majority discussion of the standard of review (slip op. at 7-9) is selective and misleading. The trial court and the prosecution are left in the dark as to how the majority reasoned its way to a reversal within analytical guidelines established by our supreme court. Compare the majority traversal of the standard of review with the following:

"The defendant challenges the propriety of the trial court's denial of his motion to suppress. Traditionally, this court has stated that when a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments, the ultimate ruling will not be disturbed on appeal unless it is manifestly erroneous. See People v. Buss, 187 Ill. 2d 144, 204[, 718 N.E.2d 1 (1999)]; People v. Gonzalez, 184 Ill. 2d 402, 411-12[, 704 N.E.2d 375 (1998)]. This deferential standard of review is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony. Gonzalez, 184 Ill. 2d at 412. Most recently, however, this court has applied the *de novo* standard of review to the ultimate ruling on a motion to suppress, relying on the Supreme Court's decision in Ornelas v. United States, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). See In re G.O., 191 Ill. 2d 37, 46-50[, 727 N.E.2d 1003 (2000)]. In Ornelas, the Court held that when an appellate court reviews a ruling on a motion to suppress involving a question of probable cause or reasonable suspicion, the reviewing court should review *de novo* the ultimate

finding with respect to probable cause or reasonable suspicion.  Ornelas, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663.  The Court cautioned, however, that findings of historical fact should be reviewed only for clear error and that reviewing courts must give due weight to inferences drawn from those facts by the fact finder.  Ornelas, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; In re G.O., 191 Ill. 2d at 47-48[, 727 N.E.2d 1003].  Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress.  In re G.O., 191 Ill. 2d at 50[, 727 N.E.2d 1003]."  People v. Sorenson, 196 Ill. 2d 425, 430-31, 752 N.E.2d 1078 (2001).

I suppose the majority would argue that what it has written is an accurate paraphrase of Sorenson.  I strongly disagree.  Absent from the paraphrase is a requirement that trial court findings of historical fact are to be reviewed only for clear error.  Absent as well is the supreme court's choice of words: "great deference" and "due weight to inferences."  I come away from this opinion with the definite impression that the majority has reweighed the historical facts *de novo*.  There is nothing in this opinion that speaks to *what* factual findings of the trial court were clearly in error or against the manifest weight of the evidence.

I am also troubled by the footnotes and to what end they have been inserted.  The first, ruminating on the word "loitering," announces it will be taken as simply "descriptive of [the group's] activity."  Slip op. at 2 n.1.  Since no one has suggested a darker meaning, I do not see

the point of the observation.

The second is more troublesome. It states that the majority "wonders" whether the radio call that prompted the police investigation was motivated by someone's desire to "extract" young men from a place where they were not wanted. Slip op. at 12-13 n.2. I am baffled by this gratuitous "wondering" when there is nothing in the record to suggest a darker meaning for the radio call. I suppose one could go on wondering *de hors* the record: that the complaint that led to the radio dispatch was from a resident weary of young men going floor to floor in the building, selling cocaine.

Footnotes 3 and 4 (slip op. at 13-14) are interesting commentaries on small corners of our fourth amendment jurisprudence, but if they are relevant to the majority analysis, the majority should say so, rather than leaving us to wonder. Footnote 4 ends with a clue: "Officer Hickey did not testify to anything the respondent did to arouse her suspicion, except perhaps being present on the second floor." Slip op. at 14 n.4. The problem with this clue is that Officer Hickey had sped to the second floor in response to a radio call that there was a crime in progress and that the defendant was at the scene.

Finally, the amendment to our fourth amendment jurisprudence announced by Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), was prompted in no small measure by a recognition that our law enforcement officers do their work in an increasingly dangerous and violent world:

"The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether

there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation. We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." Terry, 392 U.S. at 23-24, 20 L. Ed. 2d at 907-08, 88 S. Ct. at 1881.

The majority here spends some little time suggesting that the trial judge in ruling from the

bench was wrong in the way she articulated the steps to be undertaken in a <u>Terry</u> analysis. This is partly true, but the majority is holding the trial judge to an unrealistic standard of precision when ruling in real time on a motion to suppress. The trial judge got the historical facts right and concluded: "I believe it was a limited search based on the officer's reasonable belief that [she] could be in danger."

The majority discounts the officer's statement that she believed herself to be in danger because the predicate for that belief is not fleshed out to this court's satisfaction. But the trial court was satisfied based on the historical facts, and under a proper standard of review, so should we be. Based on the record, I believe that a prudent police officer would and should have done exactly what Officer Hickey did. I would affirm the trial court.